Vernon E. **HARGRAY,** Plaintiff–Appellee,

v.

**CITY OF HALLANDALE,**
Defendant–Appellant.

No. 93–5281.

United States Court of Appeals,
Eleventh Circuit.

July 19, 1995.

---

Richard Kane, Hallandale, FL, for appellant.

Robert Elliot Weisberg, Coral Gables, FL, Martha Chapman, Abling & Chapman, P.A., Orlando, FL, for appellee.

Before COX and BLACK, Circuit Judges, and FAY, Senior Circuit Judge.

PER CURIAM:

Appellee Vernon E. Hargray brought this suit under 42 U.S.C. § 1983 against his former employer, Appellant City of Hallandale (City), alleging a violation of his property interest in continued employment with the

City. Hargray maintained that he was wrongfully discharged without a pre-termination hearing when he resigned after being given a choice between resigning or facing possible criminal charges. After a non-jury trial, the district court entered judgment in favor of Hargray, and the City appealed. Because we conclude that, under the totality of the circumstances, Hargray's resignation was voluntary, we reverse on the ground that the City did not deprive him of any protected interest in his employment within the meaning of the due process clause.

## I. BACKGROUND

The full factual findings of the district court are recounted at *Hargray v. City of Hallandale,* 830 F.Supp. 1467 (S.D.Fla.1993). The facts relevant to the issue presented in this appeal are as follows. Hargray was employed by the City from 1979 until his resignation in 1990. At the time he resigned, Hargray held the position of Operations Manager in the Department of Public Works (DPW), and reported directly to the Director of the DPW, John Depp. In this position, Hargray was responsible for managing the operations of several divisions within the DPW, including the grounds and maintenance division. Hargray had direct supervisory control over at least four superintendents, who were the heads of the divisions. In total, Hargray was responsible for approximately forty employees who worked within the divisions.

Sometime in 1989, Hargray recommended an acquaintance, Richard McDonald, to the City Manager, R.J. Intindola, for the position of superintendent over grounds and maintenance. Intindola, who had the final policy-making authority for the City with respect to personnel and administration, made the final decision to hire McDonald as a superintendent. As the superintendent of grounds and maintenance, McDonald reported directly to Hargray.

In June 1990, three or four employees of the DPW approached Richard Wroblewski, the City's Personnel Director, with allegations that Hargray and McDonald were misappropriating City property for their personal use. Wroblewski sent the employees to speak with Depp. Within a few days, Wroblewski informed Hargray of the allegations of theft in his department, and Hargray began an investigation to find out who had made these allegations. Hargray also consulted McDonald, and told him that McDonald had been accused of theft. Thereafter, Hargray found out that McDonald had met with Depp concerning the allegations.

On Saturday, August 4, 1990, Hargray went to Sheridan Lumber to pick up some timber for the Hepburn Center—a social services facility that the DPW was renovating. Hargray purchased with City money thirteen 4 × 4 pieces of lumber listed on a purchase order for the Hepburn Center and loaded them onto a City truck which he was driving alone that day. Hargray drove back to the DPW compound and placed the lumber behind the compound. On August 7 or 8, 1990, Hargray took seven of the 4 × 4's home.

On August 8, 1990, City officials, including Depp, received an anonymous letter dated August 5, 1990, accusing Hargray and McDonald of gross misuses of the City's equipment and supplies.[1] Intindola directed the City police department to conduct an investigation of the allegations contained in the August 5 letter. Lieutenant William Owens and Investigator Tommy Long were primarily responsible for the investigation.

In the course of their investigation, Owens and Long photographed Hargray's house and yard. Four photos, which were introduced into evidence, revealed the following to the police. First, there were two types of plants,

---

1. Among other things, the letter alleged that:

(1) Hargray or McDonald used a City truck to transport top soil purchased by the City to his own home;

(2) Hargray or McDonald used a City truck to transport City landscaping logs to his own home;

(3) Hargray and McDonald misappropriated trees, plants, grass, sod, fertilizer, Dursban, and sprinkler supplies;

(4) Hargray and McDonald misappropriated supplies from the warehouse (the DPW compound) or directly from the vendors; and

(5) Hargray or McDonald used other City employees to make improvements on his own home during working hours.

liriopes and exorias, around the trees and house in Hargray's yard. Some of the plants were planted, and some were still in pots. Both of these plants were the type that the City's grounds and maintenance division used in its landscaping of different areas of the City. Second, there were seven 4 × 4 timbers, some placed into the yard apparently creating a landscaping border, and some stacked against the house. Third, there was evidence of new sodding. Fourth, the lawn looked quite plush, indicating that fertilizer may have been recently laid down. Finally, there was a large City garbage can located in the side yard.

In the next step of their investigation, Owens and Long pulled City purchasing records. They discovered, among other things, a purchasing order signed by both McDonald and Hargray for the 4 × 4's which were photographed in Hargray's yard, and a receipt for the 4 × 4's from Sheridan Lumber. They also discovered a requisition signed by both McDonald and Hargray for $325 worth of repairs to a trailer. This same trailer had been photographed in McDonald's yard, and McDonald later confessed to keeping the trailer for at least a few months prior to the investigation.

By the week of June 15, 1990, Owens and Long began to interview City employees by calling them down one by one to the police station for questioning. In total, twenty-eight City employees were interviewed; McDonald and Hargray were the last two to be interviewed. Many employees made allegations accusing Hargray of misappropriating City property. Summaries of the interviews were compiled into a police report.[2]

Specifically, Elfran Gomez stated that he observed Hargray and McDonald dumping personal items at a lake using a City truck on City time. Angus Bryant stated that Hargray had given McDonald permission to use a City truck for personal use at his home. John Deck told police that three months prior to the investigation he observed Hargray pick up a load of top soil from Florida Silica Sand. Deck told police that it was unusual for Hargray, a director of operations, to be personally picking up supplies, especially on a Saturday. Elbridge Dean told police that Hargray had instructed him in May or June 1990 to take approximately 20–30 plants to Hargray's house.

Andrew Smith told police that he observed Hargray and another City employee driving a City truck which contained five yards of muck, which Smith maintained was not used on a City project. Smith stated that the two returned in the truck two hours later and the muck was gone. Jose Garcia stated that on several occasions he observed Hargray and McDonald inside the DPW compound, where supplies were kept, on Saturdays. Finally, James Simmons told police that he observed Hargray and a City employee using a City truck sometime in June. After Hargray returned the truck, Simmons found a receipt inside the truck for fourteen yards of top soil from Florida Silica Sand. Simmons claimed that there was no job needing top soil at the time, and that Hargray and the other employee were the only two employees in the truck that day.

Other employees told police that, although they had not personally observed Hargray stealing City property, they had heard many rumors about his misappropriations and his using City employees to make improvements on his home during City time. Many of these same employees told police that they had personally observed McDonald misappropriating various items of City property, as well as making improvements on his home during City time. McDonald corroborated the substance of the allegations against him in his own interview with the police.

On Monday, August 20, 1990, McDonald resigned and admitted to violating City policy by using City equipment or property for his personal use. On August 23, 1990, the police called McDonald to the station and offered him the option of resolving the criminal investigation against him through admin-

---

2. Although the district court found that the report was hearsay, it did allow the report to be admitted for the limited purpose of determining whether the officers had probable cause that Hargray was misappropriating the property. As such, our overview of the summary of the report is simply to establish what Owens and Long knew at the time they questioned Hargray, as opposed to determining whether or not Hargray actually misappropriated property.

istrative rather than criminal channels. The police presented McDonald with a written agreement stating that he would answer all questions honestly in exchange for their not initiating criminal charges against him. McDonald requested to consider the offer overnight so that he could consult an attorney, and the officers allowed him to do so.

McDonald signed the agreement on August 24, and Long and Owens then conducted a two-hour taped interview regarding the allegations made against him. McDonald confessed to [3], and corroborated, many of the allegations made against him by the other employees and by the anonymous letter. He denied that Hargray had any involvement with his theft of City property, but conceded that Hargray knew that McDonald used a City truck and a City trailer for personal purposes. He also conceded that it would have been unusual for Hargray to pick up lumber himself on a Saturday.

During the week of August 15, Hargray was aware that many City employees were being called down to the police station to be interviewed regarding misappropriation of City property. He also was aware that these employees were making serious allegations against him, and he discussed his concerns with his wife. During this time, Depp and Intindola observed that at the budget meetings on Friday, August 17 and Monday, August 20, Hargray, who was usually an active participant in meetings, was "unable to respond" and seemed "preoccupied." After McDonald resigned on August 20, Hargray went into Intindola's office and told him that he knew that McDonald had the trailer and other supplies, but that Hargray had told him to return them. When Intindola asked Hargray how he could have let McDonald have these items, Hargray had no answer.

Prior to August 24, Owens had three meetings with Intindola regarding the investigation of Hargray's alleged involvement. At the third meeting, Owens told Intindola that he had probable cause to bring criminal charges of grand theft against Hargray. After discussing the situation, Intindola and Owens decided to give Hargray the option of proceeding administratively, rather than criminally. They agreed that if Hargray chose the administrative route and confessed to some wrongdoing, they should secure his resignation.

At about 2:00 p.m. on August 24, 1990, Depp informed Hargray that the police wanted to interview him and that he should go to the police station. Owens and Long commenced the investigation at about 3:30. The interview was taped, but the recording did not commence until five to ten minutes after the beginning of the interrogation. During those pre-taping minutes, Owens informed Hargray that he was the subject of a grand theft investigation. Owens handed Hargray a memo from the chief of police offering Hargray the option of resolving the allegations of impropriety in the DPW through administrative rather than criminal channels.

Initially, Hargray indicated he preferred to go the criminal route. Owens told Hargray he would give Hargray a few minutes alone to consider the choice. Before leaving the room, Owens said to Hargray "I will give you two words to think about—Sheridan Lumber." When Owens returned a few minutes later, Hargray indicated that he wanted to proceed administratively, and signed an agreement to that effect. The police then began the tape recording, during which Hargray repeatedly denied taking any City property, besides the lumber and garbage can. Hargray, however, did not have receipts for many of the items found in his yard, and he was evasive when asked how he purchased the sod in his yard. As to the lumber and

---

**3.** Specifically, McDonald confessed the following: that he used a City truck to deliver top soil to his residence; that he stole some bedrock to use in his flower garden; that he stole some 6 × 8 timbers; that he made improvements on his property during City hours; that he stole two palm trees; that he stole some hibiscus, moripy, exoria, and bougenvillia plants; that he signed for many of the items stolen on purchase orders for the City; that he misappropriated six pallets of sod after purchasing them for the City from Kelly's Sod; that he was using a City trailer which he kept in his possession and had repair work on for over a month; that he stole some sprinkler fittings, piping, and valves; and finally, that he misappropriated the time of several City employees.

the garbage can, the interrogation proceeded as follows:

> Lt. Owens: ... what, in fact, is the property misappropriated for your own use and the means by which you did it? '
>
> Mr. Hargray: Okay. I picked up the Sheridan [l]umber, I dropped it off on the weekend when McDonald was having inspections because I'd been on his case about having inspections. Later in the week, as I was working in the yard, I needed borders so I can line up, because I had weeds growing on it, so that would help me line it up ... Now, there is nothing else in my house or yard that belongs to the City.
>
> Inv. Long: How about that yellow trash can we saw at your house? ... Is that the property of the City of Hallandale?

> \*　　\*　　\*　,　　\*　　\*　　\*

> Mr. Hargray: Yes.

During this line of questioning, Hargray tried to explain that the City usually threw away the type of garbage can found in his yard. He also stated that he knew the 4 × 4's "had to come back," although he never used the term "borrow" during the taped interview. Owens then informed Hargray that even using City property temporarily is a crime, as follows:

> Lt. Owens: The bottom line of this interview is, the only property of the City of Hallandale that you misappropriated to your own personal use, or to use another word, to steal for your own personal use, either temporary—see, you have to understand what theft says. The theft statute says temporarily or permanently. Okay? So to take temporarily or permanently to your own personal use is a commission of theft. That's the reading of the statute, that's the legal end of it. There's borrowing and then there's borrowing permanently. So the only thing is one of the yellow trash cans on a temporary basis and the lumber?
>
> Mr. Hargray: That is it, that is it. That's why I felt, you know, and I even forgot

about the, like I said, you know, about the timber.

The topic of Hargray's resignation came up twice during the interview, as follows:

> Lt. Owens: I've got a couple of things. I'll put this on. Upon conclusion of this meeting, before you go home tonight, and the City manager wants your resignation—if you would like to—I believe you'll be seeing Mr. McDonald—
>
> Mr. Hargray: No—oh, yeah—
>
> Lt. Owens: —resignation?
>
> Inv. Long: Yeah, I do. John gave it to me something—two years, that is at least a guide to your—probably be appropriate. I'm assuming by the time we're done here the secretarial staff will be gone.
>
> Mr. Hargray: Well, somebody should be there.
>
> Lt. Owens: If they're not, we can have the secretarial staff here do that for you. You can either write it out yourself, or we'll give you a copy of that and you can, you know, take the appropriate verbiage from it that you feel is relevant to yours—

> \*　　\*　　\*　　\*　　\*　　\*

> Inv. Long: Good. I don't have any more questions. Do you?
>
> Lt. Owens: I have no more either, but the City Manager is adamant about the resignation before you leave today. If you want to make a call, you can use the phone out here, then call us.

At all times during the interview, Hargray was free to leave. He never requested to do so, nor did he request the assistance of an attorney or his supervisor. The interrogation concluded at about 5:00 p.m., at which time Hargray was free to leave the police station. Although the investigation was not complete at this point, pursuant to their agreement, Owens and Long abandoned the investigation as to Hargray's alleged misappropriation. Hargray then left the police station by himself, went back to the DPW building, and signed a letter of resignation which John Depp's secretary prepared for him.[4]

---

**4.** We note that the resignation letter made no mention of any agreement to resign in exchange for the police not initiating criminal prosecution. For purposes of this appeal, however, we will

Thereafter, Hargray brought an action pursuant to 42 U.S.C. § 1983, claiming that the City had violated his due process rights by forcing him to resign from his employment without a hearing in that the police led him to believe that if he did not resign he could and would be prosecuted for grand theft. The City defended the suit on the ground that Hargray's resignation was voluntary. After a non-jury trial, the district court concluded that the City had constructively discharged Hargray because his resignation was involuntary. The court awarded Hargray back pay and reimbursement in the amount of $84,884.97 and compensatory damages in the amount of $150,000, and ordered the City to reinstate him. On appeal, the City maintains first, that Hargray's resignation was voluntary, and second, that if it were involuntary, the compensatory damages awarded were excessive.[5]

## II.  STANDARD OF REVIEW

■ The City contends that the district court erred in both its factual findings and its application of the law to these findings to determine whether Hargray voluntarily resigned. This Circuit will not reverse a district court's findings of fact in actions tried without a jury unless they are clearly erroneous. *Barnes v. Lacy*, 927 F.2d 539, 542 (11th Cir.1991); Fed.R.Civ.P. 52(a). "If the court's findings are 'plausible in light of the record viewed in its entirety,'" we must accept them. *Barnes*, 927 F.2d at 542 (quoting *United States v. Fidelity Capital Corp.*, 920 F.2d 827, 836 n. 36 (11th Cir.1991)). In contrast, our review of the district court's application of the law to the facts to deter-

mine whether Hargray's resignation was involuntary is *de novo*.[6] *Barnes*, 927 F.2d at 543.

## III.  DISCUSSION

The district court found, and the City does not dispute, that Hargray had a property interest in his continued employment with the City because he was covered by the City's Civil Service rules which protected him from arbitrary dismissal. The only issue on appeal is whether the City deprived Hargray of that interest without due process. *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 537, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 574–576, 92 S.Ct. 2701, 2708–2709, 33 L.Ed.2d 548 (1972). "If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the [City] 'deprived' him of it within the meaning of the due process clause." *Stone v. University of Md. Medical Sys., Corp.*, 855 F.2d 167, 173 (4th Cir.1988). "If, on the other hand, [Hargray]'s resignation was so involuntary that it amounted to a constructive discharge, it must be considered a deprivation by [City] action triggering the protections of the due process clause." *Id.* Our constitutional inquiry therefore must focus on the voluntariness of Hargray's resignation. The answer to this question will dispose of the constitutional deprivation issue.

■ The question of whether a resignation from public employment that has been requested by an employer is sufficiently invol-

---

assume, as the district court has, that Hargray's agreement to proceed administratively and avoid criminal prosecution encompassed an agreement to resign.

5.  As we hold that Hargray's resignation was voluntary, we need not address the issue of damages.

6.  Hargray cites *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir.1989) and *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900 (11th Cir.1988), for the proposition that a finding of involuntary resignation is a factual finding. Hargray's reliance on these cases is misplaced. The courts in *Steele* and *Huddleston* were reviewing the plaintiffs' alleged constructive discharge

in the context of a hostile work environment created by sexual harassment. The only question for resolution in those cases was a factual one— whether intolerable working conditions caused by sexual harassment existed, thus forcing a constructive discharge. In contrast, here we are examining whether the district court could determine, from the facts presented, that coercion or misrepresentation, causing constructive discharge, occurred. The question of whether coercion or misrepresentation is present is a legal one, in which we are free to substitute our judgment for that of the district court. *See generally, Reich v. Dep't of Conservation and Natural Resources*, 28 F.3d 1076, 1082 (11th Cir.1994).

untary to trigger the protections of the due process clause is one of first impression in this Circuit. As an initial matter, employee resignations are presumed to be voluntary. *Angarita v. St. Louis County,* 981 F.2d 1537, 1544 (8th Cir.1992); *Alvarado v. Picur,* 859 F.2d 448, 453 (7th Cir.1988); *Christie v. United States,* 518 F.2d 584, 587, 207 Ct.Cl. 333 (1975). "This presumption will prevail unless [the employee] comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." *Christie,* 518 F.2d at 587. Those circuits that have addressed whether a resignation was involuntary agree that the court must examine the surrounding circumstances to test the ability of the employee to exercise free choice. *See Angarita,* 981 F.2d at 1544; *Parker v. Board of Regents,* 981 F.2d 1159, 1162 (10th Cir.1992); *Alvarado,* 859 F.2d at 453–54; *Stone,* 855 F.2d at 173; *Scharf v. Dep't of the Air Force,* 710 F.2d 1572, 1574 (Fed.Cir.1983); *Christie,* 518 F.2d at 587.

■ The relevant cases reveal that there are two situations in which an employee's resignation will be deemed involuntary, and thus a deprivation of due process: (1) where the employer forces the resignation by coercion or duress, *see, e.g., Schultz v. United States Navy,* 810 F.2d 1133, 1135–37 (Fed. Cir.1987); or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee, *see, e.g., Scharf,* 710 F.2d at 1574–76; *Covington v. Department of Health & Human Serv.,* 750 F.2d 937, 942–44 (Fed.Cir.1984).

A. *Resignations Obtained by Coercion or Duress*

■ Under the coercion or duress theory, we consider whether, under the totality of the circumstances, the employer's conduct in obtaining the employee's resignation deprived the employee of free will in choosing to resign. Other circuits addressing this issue have indicated that certain factors may be helpful in determining whether the resignation was obtained by coercion or duress: (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel. *Stone,* 855 F.2d at 174, 177. *See also Angarita,* 981 F.2d at 1544; *Parker,* 981 F.2d at 1162; *Schultz,* 810 F.2d at 1136; *Scharf,* 710 F.2d at 1574. These factors, although not dispositive, will guide us in our determination of whether Hargray's resignation was involuntary under the totality of the circumstances.

■ "[T]he assessment [of] whether real alternatives were offered is gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive his only option to be resignation ... is irrelevant." *Stone,* 855 F.2d at 174. *See Christie,* 518 F.2d at 587–88. Moreover, "the mere fact that the choice is between comparably unpleasant alternatives ... does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary." *Stone,* 855 F.2d at 174.

■ Specifically, resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges. *Pitt v. United States,* 420 F.2d 1028, 190 Ct.Cl. 506 (1970). Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because "the fact remains that plaintiff *had a choice.* [Plaintiff] could stand pat and fight." *Christie,* 518 F.2d at 587. The one exception to this rule is where the employer actually lacked good cause to believe that grounds for the termination and the criminal charges existed. *Stone,* 855 F.2d at 174; *Schultz,* 810 F.2d at 1136–37; *Christie,* 518 F.2d at 587–88.

The City contends that Hargray's resignation was voluntary because he was given a choice between resigning or facing criminal charges. Hargray contends that this was not a real choice, and that he had no other choice but to resign. The district court found that Hargray did not have a real alternative to resigning. The district court based this conclusion primarily on its findings that (1) Har-

gray was not given advance notice of the nature of the charges against him; (2) he did not have an opportunity to consider alternatives; (3) he did not have an opportunity to consult an attorney; (4) he did not have a reasonable amount of time to make a carefully-considered decision; and (5) he did not have the opportunity to select the effective date of his resignation. The court also found that Hargray felt intimidated during the interview.

■ Initially, the City challenges many of the factual findings made by the district court. The record supports the City's position as to at least two of these findings. First, the record supports the City's contention that Hargray did have advance notice that charges may be brought against him. Hargray testified that he knew that many employees were being called down to the police station to be questioned about City misappropriation. He was also aware that there had been serious allegations made against him, and discussed these allegations with his wife. He knew that McDonald had resigned on August 20, that McDonald was called to the police station on August 23, and that McDonald elected to consult an attorney and did so after asking the police to delay his interrogation. In fact, after finding out that McDonald had resigned, Hargray confessed to Intindola that he knew McDonald had the trailer. In light of Hargray's own testimony, a finding that Hargray had no advance notice that criminal charges might be made against him is clearly erroneous.

■ The second factual finding that is inconsistent with the record is the finding that Hargray was not given an opportunity to consider alternatives. As already noted, Hargray was aware that the allegations against him would be investigated at least a few weeks before he was called to the police station. He also knew that McDonald resigned and consented to answer questions in exchange for not being criminally prosecuted. During that time, Hargray had the opportunity to consider whether he would go to the police station at all, whether he would answer questions, and whether he would resign, if

asked to do so, or "stand pat and fight," even if it meant criminal charges being pressed. He and his wife discussed at length what was occurring, and he was obviously preoccupied during the budget meetings. No other conclusion could be reached but that he had ample opportunity to think long and hard about what he would do when he was called down for questioning.

■ As such, Hargray's argument is reduced to the following: that he was forced to make an unpleasant decision in a short period of time, while he felt intimidated, without the advice of an attorney. Unfortunately for Hargray, the mere fact that he was forced to choose between two inherently unpleasant alternatives does not in itself mean that his resignation was submitted under duress, absent evidence that the police or Intindola lacked good cause for the threatened criminal proceedings at the time the alternatives were offered. *Stone*, 855 F.2d at 174; *Christie*, 518 F.2d at 587–88.

A careful review of the record convinces us that at the time Hargray resigned, there was no evidence to suggest that Intindola or the police knew or believed that charges of grand theft could not be substantiated. At the time of his third meeting with the police, Intindola was aware of the following: (1) that there had been an anonymous letter written accusing Hargray of stealing City property; (2) that other employees had approached Wroblewski accusing Hargray of taking City property; (3) that the photos taken of Hargray's yard depicted City timbers and a City garbage can,[7] as well as plants and sodding used by the City; and (4) that Hargray was aware that McDonald was using City property for personal use. Thus, the record does not establish that Intindola lacked good cause to threaten proceeding criminally at the time he authorized the police to offer Hargray the two alternatives. In fact, the record establishes that Intindola had more than enough evidence to threaten Hargray with criminal action. The record further establishes that the police had sufficient evidence to support

---

**7.** At the time of the meeting, Intindola testified that he was not aware that Hargray had received

permission from Grover Jones to borrow the garbage can.

probable cause for threatening criminal prosecution, as discussed herein.

■ It is true that Hargray was forced to make the decision to resign while under time pressure and that he did so without the advice of counsel. While these facts might seem sufficient to support the conclusion that Hargray's resignation was involuntary, the cases finding a resignation to be involuntary based on coercion or duress involve circumstances much more coercive than those in the instant case. For example, in *Paroczay v. Hodges*, 297 F.2d 439 (D.C.Cir.1961), the court found the employee's resignation to be involuntary where the employee was told he had to sign a resignation letter before he left the supervisor's room, or charges would be filed immediately, despite his repeated requests to have more time and to consult an attorney. In *Angarita v. St. Louis County*, 981 F.2d 1537 (8th Cir.1992), the court found that employee police officers suspected of using drugs involuntarily resigned under another set of extremely coercive circumstances. Specifically, they were told that they were *not permitted to leave* the interrogation room without first signing a resignation form; no specific complaint of their actions was presented to them; their requests to speak with their supervisors or have them present were continually denied; they were threatened with disclosure of the allegations to their family; they were threatened with adverse publicity in the media; a tape recorder was turned off many times during the interrogation; and they were not told the source of their allegations, among other things. *Id.* at 1545.

■ In contrast to these cases, neither the *district court's findings* nor the record in the instant case supports the legal conclusion that Hargray's resignation was coerced. Instead, the record reveals: (1) that Hargray was free to leave the police station before signing a resignation statement; (2) that he knew what the charges were against him; (3) that he knew the sources of the allegations; and (4) that he never requested more time to make a decision, nor did he request to speak with his supervisor or an attorney. Moreover, other than the first few minutes while Hargray was choosing whether to proceed administratively, the entire conversation was on tape. The transcript of the tape reveals that the officers conducted a routine police inquiry. In fact, the tape indicates that the interview was conducted under a casual atmosphere, during which Hargray at times even laughed with the police. Finally, although Hargray may have felt intimidated, we must keep in mind that the test of coercion is conducted via an objective analysis, rather than by the employee's subjective evaluation of the situation. *Stone*, 855 F.2d at 174; *Walsh v. City of Chicago*, 712 F.Supp. 1303, 1308 (N.D.Ill.1989). Objectively, the findings of the district court, in addition to the evidence contained in the record, do not, under the totality of the circumstances, support the legal conclusion that Hargray's resignation was involuntary due to coercion or duress.

B. *Resignations Obtained by Misrepresentation*

■ The district court also found Hargray's resignation to be involuntarily obtained by misrepresentation. Under the misrepresentation theory, a court may find a resignation to be involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation. *Scharf*, 710 F.2d at 1575. A misrepresentation may be material if it concerns an alternative to resignation, such as the possibility of criminal prosecution. *See Covington*, 750 F.2d at 942; *Walsh*, 712 F.Supp. at 1308–09.

■ Further, an employee is not required to show that the employer intentionally deceived him in order for his resignation to be held involuntary. *Scharf*, 710 F.2d at 1575. Just as the duress or coercion theories apply an objective test, the objective standard is equally applicable in situations involving misrepresentation. The court, therefore, "will neither inquire into the subjective perceptions of the employee, *see Taylor v. United States*, 591 F.2d 688, 692, 219 Ct.Cl. 86 (1979), nor the subjective intentions of [the employer]." *Scharf*, 710 F.2d at 1575. Thus, in the instant case, Hargray must show (1) that the City knew, or reasonably should have known, that the threatened criminal

prosecution could not be substantiated. *Schultz,* 810 F.2d at 1136, and (2) that Hargray reasonably relied on the City's misrepresentation. *Scharf,* 710 F.2d at 1575.

■ As the parties concede that Hargray reasonably relied on the police officers' representations that he could be prosecuted for grand theft, the question is whether the police knew, or reasonably should have known, that charges of grand theft could not be substantiated against Hargray. In the instant case, as the individuals who ultimately obtained Hargray's resignation were police officers, rather than the City's manager, the question may be analyzed in terms of whether or not the police officers had probable cause to prosecute Hargray for grand theft at the time that they requested his resignation.

The district court found that the police officers did not have probable cause. *Hargray,* 830 F.Supp. at 1473. Hargray agrees, claiming that the police could not have probable cause based solely on his admission that he borrowed the garbage can and the timber. The City responds that probable cause to prosecute for grand theft was based not only on the garbage can and timbers, which the police did not know Hargray had borrowed, but also on other allegations of misappropriation, which were corroborated by the evidence and the witnesses.

The question of what amounts to probable cause is purely a question of law and hence is subject to plenary review by this court. *United States v. Allison,* 953 F.2d 1346, 1350 (11th Cir.1992). After a thorough review of the record, we conclude, contrary to the district court, that the police had probable cause to bring charges of grand theft against Hargray at the time they requested his resignation.

The Florida criminal theft statute provides that a person commits theft if he knowingly obtains or uses the property of another with intent to, either temporarily or permanently, deprive the other person of a right to the property or a benefit therefrom, or appropriate the property to his own use or to the use of any person not entitled thereto. Fla.Stat. Ann. § 812.014 (West 1993); *Daniels v. State,* 587 So.2d 460, 462 (1991). It is grand theft if the property stolen is valued at $300 or more. Fla.Stat.Ann. § 812.014(2)(c)(1).

The existence of probable cause is based on objective standards and the totality of the circumstances. *United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir.1989). "Probable cause to arrest is present when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Mastrangelo,* 733 F.2d 793, 799 (11th Cir.1984). As such, the existence of probable cause in the instant case is a two-step inquiry: First, what did the police officers actually know at the time they threatened Hargray with prosecution for grand theft, and second, based on such knowledge, would a reasonable police officer believe that there was probable cause to prosecute Hargray.

At trial, Owens testified that by the time he began his interrogation of Hargray, he knew the following: (1) that an anonymous letter accusing Hargray of misappropriation had been sent to City managers; (2) that three City employees had gone to Wroblewski accusing Hargray of misappropriation; (3) that many other employees interviewed by the police had either personally observed Hargray taking property or had heard about it, thereby corroborating the accusations contained in the letter and in the complaints; (4) that pictures of Hargray's house revealed the existence of a City garbage can, timbers arranged in an apparently permanent nature for landscaping purposes, plants used by the City, new sodding, and an extremely plush, heavily fertilized lawn; (5) that City purchasing orders were signed by Hargray for many of the items found in his yard, which were valued at over $300; and (6) that Hargray was aware that McDonald was using a City trailer for his personal use.

Owens further testified, and the tape reveals, that during the taped interview Hargray admitted taking the garbage can and the timbers home for his own personal use. Although at trial Hargray states that he

borrowed the garbage can with the permission of Grover Jones, and that he borrowed the timbers for a party, he never stated that he "borrowed" anything during the interview.[8] Thus, at the time Owens asked for Hargray's resignation, he did not know that Hargray had allegedly borrowed these two items. Finally, Owens testified that Hargray was extremely evasive when questioned as to how he obtained the sodding in his yard.

Long also testified that by the time he began his interrogation of Hargray, he knew the following: (1) that an anonymous letter accusing Hargray of misappropriation had been sent to City managers; (2) that many other employees interviewed by the police had either personally observed Hargray taking property or had heard about it, thereby corroborating the accusations contained in the letter; (3) that pictures of Hargray's house revealed the existence of many of the items alleged to have been stolen from the City; (4) that City purchasing orders were signed by Hargray for many of the items found in his yard; (5) that Hargray was aware that McDonald was using the City trailer for his personal use; and (6) that McDonald had corroborated the allegations made in the anonymous letter against him and the allegations made against him by the City employees during their police interviews. Long testified that during Hargray's interview, he admitted taking City lumber and a garbage can. Long also noted that

Hargray could not account for how he obtained the sod in his yard.

Based on the totality of the circumstances and the officers' knowledge described above, we hold that at the time of the interrogation, Owens and Long had probable cause to bring charges of grand theft against Hargray.[9] At the time of the investigation, the facts and circumstances within the officers' knowledge were sufficient to warrant a man of reasonable caution in believing that an offense had been committed. *United States v. Tomaszewski*, 833 F.2d 1532, 1535 (11th Cir.1987). As such, the police officers did not misrepresent to Hargray that the alternative to his resignation was proceeding with a grand theft criminal investigation. Consequently, Hargray's resignation cannot be deemed involuntary under the misrepresentation theory.

## IV.  CONCLUSION

In sum, we hold that the only reasonable conclusion from the record is that Hargray made a voluntary decision to resign from his position with the City rather than submit to a grand theft criminal investigation. Hargray has attempted to characterize his voluntary resignation as a constructive discharge, entitling him to reinstatement and damages for a resulting deprivation of his property interest in continued employment. He has failed,

---

**8.** Although Hargray admitted that he knew the 4 × 4's "had to come back," he did not state during the taped interview that he had permission to borrow either of these items, or that he intended to return these items. Thus, although it is true that Owens advised Hargray that he could be prosecuted for grand theft for "borrowing," Hargray never told Owens during the interview that he was merely borrowing these items.

Even assuming, arguendo, that the officers knew that Hargray borrowed the garbage can and timber, as the district court found, the officers nevertheless had probable cause to bring charges of grand theft against Hargray. First, it is apparent that the officers based the existence of probable cause not only on the garbage can and the timber, but also on the other items that the anonymous letter and the other City employees accused Hargray of stealing, in combination with Hargray's inability to account for the way in which he obtained such items.

Second, even if the garbage can and the timber were the only items at issue, the officers did not

misrepresent that they had probable cause to bring charges for grand theft, because grand theft includes the temporary taking of the property of another. *See Daniels*, 587 So.2d at 462. Thus, Hargray's admission to the police that he in fact took home the garbage can and the timbers for his personal use establishes that there was probable cause to believe grand theft had been committed. Even if the interrogation had revealed an actual intent on the part of Hargray to return these items, the officers had probable cause to prosecute Hargray for temporarily depriving the City of its property.

**9.** We note that after Hargray signed his resignation, the police abandoned their investigation of Hargray, and Owens admitted at trial that much more would have had to be done with the case before it was presented to the State Attorney. This fact, however, does not vitiate our conclusion that the police had probable cause at the time they told Hargray he could be prosecuted for grand theft.

however, to overcome the presumption of voluntary resignation, either by the duress or coercion theory or by the misrepresentation theory. As Hargray's resignation was voluntary, we conclude that he was not deprived of any protected interest in his employment by the City. As such, he has no due process claim, and is entitled to neither reinstatement nor damages.

REVERSED.