[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11433
Non-Argument Calendar

_____

D.C. Docket No. 2:15-cv-01812-RDP

JOHN T. CARPENTER, JR.,

Plaintiff-Appellant,

versus

THE UNIVERSITY OF ALABAMA HEALTH SERVICES FOUNDATION PC,
a domestic professional non-profit corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 10, 2019)

Before JILL PRYOR, BRANCH and JULIE CARNES, Circuit Judges.

PER CURIAM:

Dr. John Carpenter, Jr., a physician who previously held a staff position with the University of Alabama Health Services Foundation ("UAHSF") and a tenured faculty position at University of Alabama at Birmingham's ("UAB") School of Medicine, brought a § 1983 claim against UAHSF, alleging a violation of his property interest in continued employment in both positions when he was wrongfully discharged without a pre-termination hearing. The district court granted summary judgment to UAHSF, concluding that Carpenter failed to create a genuine issue of material fact regarding whether he voluntarily resigned from his position. We agree because, even viewing the evidence in the light most favorable to Carpenter, his resignation was voluntary. He thus was not deprived of any protected interest in his employment within the meaning of the Due Process Clause. We affirm the district court.

## I.    FACTUAL BACKGROUND

Carpenter worked as a professor at the UAB School of Medicine for approximately 40 years. For most of this time, he was a tenured faculty member. Besides serving as a UAB faculty member, he practiced medicine as an employee of UAHSF.[1] He worked as an oncologist specializing in breast cancer.

---

[1] UAHSF is a non-profit corporation through which all UAB medical care is provided. UAB faculty members, like Carpenter, also have employment contracts with UAHSF to provide health care services at UAB-affiliated hospitals and clinics.

2

This case arises out of Carpenter's treatment of a patient with breast cancer. Carpenter treated the patient with hormone therapy for approximately two years before the patient began chemotherapy. According to Carpenter, he delayed treating the patient with chemotherapy because she was depressed and did not want to begin that treatment. While the patient continued on hormone therapy, Carpenter also prescribed her an antidepressant drug. When the patient told Carpenter she was ready, he had her begin chemotherapy.

After the patient began chemotherapy, she was seen by Dr. Jennifer De Los Santos, a UAB radiation oncologist. De Los Santos was concerned that Carpenter had treated the patient with only hormone therapy for such a long period while her breast cancer was progressing. De Los Santos reported Carpenter to UAHSF's risk management committee for inappropriate care of a patient. De Los Santos also called Dr. Boris Pasche, Carpenter's supervisor, with her concerns. De Los Santos told Pasche that Carpenter's treatment of the patient was "egregious," "outside of guideline[s], and "high risk." Doc. 40-5 at 9.[2]

Pasche relayed De Los Santos's concerns to Dr. Robert Bourge, the vice chair of clinical affairs in UAB's Department of Medicine. Bourge also discussed Carpenter's treatment of the patient with the risk management committee and with Dr. Seth Landefeld, the chair of UAB's Department of Medicine.

---

[2] Citations in the form "Doc. #" refer to numbered entries on the district court's docket.

Later that day, Pasche's secretary told Carpenter that once he finished seeing patients, he needed to go see Pasche. Carpenter had no advance warning about the purpose of the meeting. When Carpenter arrived to see Pasche, Pasche escorted him to Landefeld's office. Carpenter then met with Bourge, Pasche, and other department administrative personnel. Pasche told Carpenter about De Los Santos's complaint. Pasche indicated that he had discussed the matter with the risk management committee and determined that the patient had been treated too long with preoperative treatment and that the case had not been managed according to guidelines set forth in current medical research. Pasche said he had told the committee that he thought Carpenter "had no clinical judgment, and that if anybody came to see [Carpenter] on a given day, that . . . there was absolutely no way to predict what advice [Carpenter] might give them." Doc. 40-4 at 16. Pasche then told Carpenter that the risk management committee had concluded that such a doctor could not practice at UAB. Pasche told Carpenter that he would have to resign. During the meeting, Carpenter had no opportunity to respond to the accusations.

After Pasche stated that Carpenter should resign, Bourge explained to Carpenter that there was an alternative to resigning, which was that he could have a hearing. Bourge provided no information about the procedures for the hearing, but Carpenter understood that the hearing would review the appropriateness of the

4

patient's treatment. Bourge warned Carpenter that the outcome of the hearing would be reported to the National Practitioner Database and that Bourge had prevailed in every hearing in which he had participated.

At the meeting, Carpenter was not asked to decide whether he would resign. He also was not given a deadline when he had to make his decision. Carpenter was told that his patients would be reassigned to other physicians, although he would be permitted to complete his patient notes. Carpenter felt overwhelmed and intimidated during the meeting.

After the meeting ended, Pasche and Carpenter talked for a few more minutes. Pasche told Carpenter that "he felt it would not be possible to get the [risk management] committee to reconsider its decision" and that it would not be possible for Carpenter to continue to practice at UAB given the information Pasche had told the risk management committee. Doc. 40-4 at 19. Pasche suggested that Carpenter potentially could continue teaching and research in a voluntary, unpaid faculty position.

After the meeting, Carpenter believed that even if he pursued a formal hearing, he would not be reinstated. He also understood that if there was an adverse result at the hearing, it would be reported to the National Practitioner Database. Carpenter knew that if a termination was reported to the National

Practitioner Database, it would become public knowledge and would make it more difficult for him to be hired in the future.

Carpenter then returned to the clinic and told his nurse that he was going to have to resign. He went home and reported to his wife that he was going to have to resign because, based on what he had been told at the meeting, there was no chance that he could prevail at the hearing. The next day Carpenter weighed his options of resigning or pursuing a hearing. He discussed the situation with one or two friends but did not consult an attorney or speak with anyone at UAB. Carpenter also did not review the UAB faculty handbook, which set forth the procedures that would have governed the hearing.

The following day—two days after the initial meeting—Carpenter and Pasche met for about 20 minutes. Pasche again told Carpenter "he thought there was no possibility of reconsideration or reversal of the committee's decision and that he thought there was zero chance that [Carpenter] could ever practice again at UAB no matter what." Doc. 40-4 at 23. Pasche then provided Carpenter with a pre-prepared resignation later, which Carpenter signed.

A few days after signing the letter, Carpenter had second thoughts about resigning. Carpenter asked Landefeld to allow him to withdraw his resignation so that he could proceed with a hearing. Carpenter also provided Landefeld with copies of medical articles that he claimed supported his decision to treat the patient

6

with hormone therapy for an extended period of time. Landefeld told Carpenter that he could regain clinical privileges only if Pasche and another physician agreed to his reinstatement. Eventually, UAB sent Carpenter a letter stating that his resignation was final and that UAB had no mechanism for him to rescind his resignation.

Carpenter sued UAHSF in state court, alleging that he had been denied due process under the Fourteenth Amendment and the Alabama Constitution because he had not received a pre-termination hearing. UAHSF removed the case to federal court.[3] In federal court, UAHSF moved for summary judgment, arguing that Carpenter had voluntarily resigned and thus waived his right to a hearing. The district court granted summary judgment to UAHSF on Carpenter's federal due process claim, concluding that Carpenter had "voluntarily relinquished any property interest" in his continued employment when he resigned. Doc. 49 at 12. The court declined to exercise supplemental jurisdiction over Carpenter's state law due process claim. This is Carpenter's appeal.

---

[3] Carpenter also sued the Board of Trustees of the University of Alabama, which joined in the removal of the suit. At the motion to dismiss stage, the district court determined that the Board of Trustees was entitled to immunity from suit. Carpenter has not appealed the district court's dismissal of his claims against the Board of Trustees.

7

## II.    STANDARD OF REVIEW

"We review *de novo* the district court's grant of summary judgment, construing the facts and drawing all reasonable inferences in favor of the nonmoving party." *Smelter v. S. Home Care Servs., Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018).  Summary judgment is appropriate if the record gives rise to "no genuine dispute as to any material fact," such that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    DISCUSSION

Carpenter contends that UAHSF violated his constitutional right to procedural due process when his employment was terminated without a hearing. We assume for purposes of this appeal that Carpenter, as a tenured professor, had a property interest in his continued employment.  The issue on appeal is whether UAHSF deprived Carpenter of this property interest without due process.  If Carpenter resigned of his own "free will even though prompted to do so by events set in motion by [UAHSF], he relinquished his property interest voluntarily and thus cannot establish that [UAHSF] deprived him of it within the meaning of the due process clause." *Hargray v. City of Hallandale*, 57 F.3d 1560, 1567 (11th Cir.

1995) (internal quotation marks omitted).  But if Carpenter's resignation "was so involuntary that it amounted to a constructive discharge," it qualified as a deprivation that triggered due process protections.  *Id.* (internal quotation marks omitted).  Our inquiry thus focuses on the voluntariness of Carpenter's resignation.

We presume that an employee's resignation is voluntary unless the employee comes forward with "sufficient evidence to establish that the resignation was involuntarily extracted."  *Id.* at 1568 (internal quotation marks omitted).  We have identified two circumstances when an employee's resignation will be deemed involuntary:  when the employer either "forces the resignation by coercion or duress" or "obtains the resignation by deceiving or mispresenting a material fact to the employee."  *Id.*  Carpenter contends that he was forced to resign under duress.[4]

To evaluate Carpenter's claim of duress, we must consider whether, under the totality of the circumstances, UAHSF's conduct in obtaining Carpenter's resignation "deprived [him] of free will in choosing to resign."  *Id.*  We have identified a non-exhaustive list of factors to guide our analysis:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the

---

[4] On appeal, Carpenter also contends that UAHSF obtained his resignation through deception or misrepresenting a material fact.  But we will not consider this argument, which Carpenter failed to raise in the district court and makes for the first time on appeal.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

effective date of the resignation; and (5) whether the employee had the advice of counsel.

*Id.* Here, after considering these factors and the totality of the circumstances, we agree with the district court that, even viewing the evidence in the light most favorable to Carpenter, he was not forced to resign.

Beginning with the first factor, we conclude that Carpenter had an alternative to resignation. Carpenter could have refused to resign and challenged his termination at a hearing. Carpenter contends that Pasche's statement that the risk management committee's decision would not be reconsidered indicates that the hearing was not a meaningful alternative. But the objective evidence shows that the hearing was a meaningful alternative because UAB's faculty handbook stated that the termination hearing would have been held before a separate hearing committee. Although Carpenter could have stood firm and fought the charges against him, he elected to resign his position.[5]

We do not dispute that Carpenter perceived resignation to be his only option. Carpenter viewed the hearing as an unpleasant alternative given the risk that if he lost at the hearing, his termination would be reported to the National Practitioner Database. As Carpenter explained, such a report would have been "humiliating"

---

[5] Carpenter alternatively argues that he could have been considered to be "constructively discharged when his clinical privileges were immediately revoked" at the initial meeting. Reply Br. at 3. Because he raises this argument for the first time in a reply brief, it is not properly before us. *See Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003).

10

and made it "very difficult" for him to secure future employment.  Appellant's Br. at 17.  But in applying this factor, we use an objective standard, not Carpenter's subjective perception, to assess whether an alternative was available.  *See Hargray*, 57 F.3d at 1568. ("The assessment of whether real alternatives were offered is gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive his only option to be resignation is irrelevant." (alterations adopted) (internal quotation marks omitted)).  The fact that Carpenter was forced to choose "between comparably unpleasant alternatives" does not alone establish that his resignation was involuntary.  *Id.* (internal quotation marks omitted).  Applying this objective standard, we conclude that Carpenter had the option to pursue a hearing and thus had an alternative to resignation.

Carpenter also argues that the option to pursue the hearing did not qualify as a meaningful alternative because he might have been terminated after the hearing. He contends that to qualify as an alternative, the option had to "offer continued employment."  Appellant's Br. at 17.  Not so.  We explained in *Hargray* that a resignation can be voluntary even when the only alternative is facing possible termination for cause.  *See Hargray*, 57 F.3d at 1568; *Christie v. United States*, 518 F.2d 584, 588 (Ct. Cl. 1975) ("This court has repeatedly upheld the

11

voluntariness of resignations where they were submitted to avoid threatened termination for cause.").

Carpenter further contends that the first *Hargray* factor has not been satisfied because UAHSF lacked good cause to terminate him.  We have said that this factor will not be satisfied when an "employer actually lacked good cause to believe that grounds for the termination . . . existed."  *Hargray*, 57 F.3d at 1568.  But to establish that UAHSF lacked good cause, Carpenter was required to identify evidence that suggested UAHSF "knew or believed" that its reason for threatening to remove Carpenter "could not be substantiated."  *Id.* at 1569; *see Schultz v. U.S. Navy*, 810 F.2d 1133, 1136 (Fed. Cir. 1987) (stating that an employee must "show that the [employer] knew that the reason for the threatened removal could not be substantiated").  Put differently, good cause will exist so long as the employer had "prima facie evidence that an arguable basis for discharge existed."  *Christie*, 518 F.2d at 588.

Here, there is no evidence that UAHSF knew or believed that its reason for threatening to remove Carpenter could not be substantiated.  UAHSF had an arguable basis to discharge Carpenter based on his decision to treat a patient with pre-operative hormones for two years while her cancer was progressing instead of pursuing chemotherapy.  Doc. 40-5 at 8-9.  The record evidence shows that the UAHSF physicians who reviewed the patient's records believed that Carpenter's

12

decision was "unacceptable" as a medical strategy, Doc. 40-4 at 16, and that he had placed the patient at risk. In light of this evidence, UAHSF had a good faith basis to believe that it had grounds to discharge Carpenter.

Turning to the second *Hargray* factor, we conclude that Carpenter understood that there was a choice available to him and that he could either resign or pursue a hearing. Carpenter contends that he did not understand that there was an alternative to resigning because Pasche told him that he had to resign. But there is no dispute that Bourge clarified that Carpenter had an alternative option, which was to pursue a hearing. And Carpenter testified that he was told at the meeting that he had a choice. Given Carpenter's testimony that he was told he could pursue a hearing, no reasonable could jury could find that Carpenter did not know he had a choice.

Carpenter argues that this factor is not satisfied because he lacked a "complete understanding of what the choices were before him." Appellant's Br. at 20. He asserts that he was misled about the true nature of the choice before him because Pasche had falsely told him that the committee's decision was irrevocable and could not be reconsidered at the hearing. Even if Carpenter left the meeting unclear about the hearing procedures, he had an opportunity to consult the UAB faculty handbook to review those procedures before deciding to resign but failed to do so.

13

Regarding the third *Hargray* factor, we conclude that Carpenter was given a reasonable time to decide whether to resign.  We accept that Carpenter was caught off-guard at the initial meeting.  But there is no evidence that anyone at the meeting made Carpenter decide on the spot whether to resign or request a hearing. Carpenter instead was permitted to leave the meeting without deciding and then used the next day to consider his decision.  Before making up his mind, Carpenter spoke with his wife and one or two friends about the decision.  Carpenter could have used this time to consult with an attorney or review the UAB faculty handbook provisions regarding the termination hearing, but he chose not to do so. On the second day after the meeting, Carpenter resigned.  Because Carpenter was given a meaningful opportunity to weigh his options, this factor suggests that his resignation was voluntary.

In support of his argument that he was not given a reasonable time to consider his options, Carpenter cites to our decision in *Rodriguez v. City of Doral*, 863 F.3d 1343 (11th Cir. 2017).  But *Rodriguez* is distinguishable.  In *Rodriguez*, we concluded that an employee was not given a reasonable time when he had only five minutes to decide whether to resign or accept his termination.  *Id.* at 1354. Unlike the employee in *Rodriguez* who was forced to make a snap, on-the-spot decision, Carpenter was given considerably more time to weigh his options and decide whether to resign or fight the charges.

14

We acknowledge that the two final factors—whether Carpenter was permitted to choose the date of his resignation (no) and whether he received the advice of counsel (no)—favor Carpenter to some extent.  But the advice of counsel factor carries little weight here given that Carpenter chose not to seek legal advice in the period between the initial meeting and signing the resignation letter.  Importantly, there is no indication that during this period anyone prevented Carpenter from consulting with a lawyer.

After considering the totality of the circumstances in this case, we cannot say that a reasonable jury could find that Carpenter was under duress when he resigned.  As we have explained above, Carpenter had an alternative to resigning because he could have pursued a hearing.  In addition, he was given a reasonable time to decide between his options.  True, Carpenter did not fully understand the procedures governing the hearing.  But we again return to the fact that he had the opportunity to learn about the hearing procedures prior to submitting his resignation but failed to do so.  Weighing all these factors, we conclude that Carpenter failed to create a genuine issue of material fact about whether he resigned voluntarily.  Because Carpenter resigned of his own free will, even

though prompted to do so by events set in motion by UAHSF, he cannot establish any unconstitutional deprivation.[6]

## IV.    CONCLUSION

For the reasons set forth above, we affirm the district court's order granting summary judgment to UAHSF.

**AFFIRMED.**

---

[6] Carpenter also argues that to survive summary judgment, he had to come forward with only a scintilla of evidence that he resigned under duress.  He relies on an Alabama state court decision to support this argument.  Carpenter contends that we should apply Alabama's state-law summary judgment standard because the dispute arose in Alabama, Carpenter is an Alabama citizen, and UAHSF is organized under Alabama law.  This argument is meritless.  A federal district court must apply the federal summary judgment standard set forth in Federal Rule of Civil Procedure 56, not the standard provided by state law.  *See Hanna v. Plumer*, 380 U.S. 460, 469-70 (1965).