# SUPREME COURT OF THE UNITED STATES

————

Nos. 14A393, 14A402 and 14A404

————

MARC VEASEY, ET AL.

14A393                  *v.*

RICK PERRY, GOVERNOR OF TEXAS, ET AL.

ON APPLICATION TO VACATE STAY

TEXAS STATE CONFERENCE OF NAACP
BRANCHES, ET AL.

14A402                  *v.*

NANDITA BERRY, TEXAS SECRETARY
OF STATE, ET AL.

ON APPLICATION TO VACATE STAY

UNITED STATES *v.* TEXAS, ET AL.

14A404

ON APPLICATION TO VACATE STAY

[October 18, 2014]

The applications to vacate the stay entered by the United States Court of Appeals for the Fifth Circuit on October 14, 2014, presented to Justice Scalia and by him referred to the Court are denied. The motion for leave to file the response to the applications under seal with redacted copies for the public record is granted.

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

I would vacate the Fifth Circuit's stay of the District Court's final judgment enjoining the enforcement of Senate Bill 14.

This case is unlike the Ohio and North Carolina applications recently before the Court concerning those States'

election procedures. Neither application involved, as this case does, a permanent injunction following a full trial and resting on an extensive record from which the District Court found ballot-access discrimination by the State. I would not upset the District Court's reasoned, record-based judgment, which the Fifth Circuit accorded little, if any, deference. Cf. *Purcell* v. *Gonzalez*, 549 U. S. 1, 5 (2006) (*per curiam*) (Court of Appeals erred in failing to accord deference to "the ruling and findings of the District Court"). The fact-intensive nature of this case does not justify the Court of Appeals' stay order; to the contrary, the Fifth Circuit's refusal to home in on the facts found by the district court is precisely why this Court should vacate the stay.

Refusing to evaluate defendants' likelihood of success on the merits and, instead, relying exclusively on the potential disruption of Texas' electoral processes, the Fifth Circuit showed little respect for this Court's established stay standards. See *Nken* v. *Holder*, 556 U. S. 418, 434 (2009) ("most critical" factors in evaluating request for a stay are applicant's likelihood of success on the merits and whether applicant would suffer irreparable injury absent a stay). *Purcell* held only that courts must take careful account of considerations specific to election cases, 549 U. S., at 4, not that election cases are exempt from traditional stay standards.

In any event, there is little risk that the District Court's injunction will in fact disrupt Texas' electoral processes. Texas need only reinstate the voter identification procedures it employed for ten years (from 2003 to 2013) and in five federal general elections. To date, the new regime, Senate Bill 14, has been applied in only three low-participation elections—namely, two statewide primaries and one statewide constitutional referendum, in which voter turnout ranged from 1.48% to 9.98%. The November 2014 election would be the very first federal general elec-

tion conducted under Senate Bill 14's regime. In all likelihood, then, Texas' poll workers are at least as familiar with Texas' pre-Senate Bill 14 procedures as they are with the new law's requirements.

True, in *Purcell* and in recent rulings on applications involving voting procedures, this Court declined to upset a State's electoral apparatus close to an election. Since November 2013, however, when the District Court established an expedited schedule for resolution of this case, Texas knew full well that the court would issue its ruling only weeks away from the election. The State thus had time to prepare for the prospect of an order barring the enforcement of Senate Bill 14. Of greater significance, the District Court found "woefully lacking" and "grossly" underfunded the State's efforts to familiarize the public and poll workers regarding the new identification requirements. No. 13–cv–00193 (SD Tex., Oct. 9, 2014), pp. 20, 31–32, 91, n. 398 (Op.). Furthermore, after the District Court's injunction issued and despite the State's application to the Court of Appeals for a stay, Texas stopped issuing alternative "election identification certificates" and completely removed mention of Senate Bill 14's requirements from government Web sites. See Emergency Application to Vacate Fifth Circuit Stay of Permanent Injunction 11 and App. H. In short, any voter confusion or lack of public confidence in Texas' electoral processes is in this case largely attributable to the State itself.

Senate Bill 14 replaced the previously existing voter identification requirements with the strictest regime in the country. Op. 20–21. The Bill requires in-person voters to present one of a limited number of government-issued photo identification documents. *Ibid.* Texas will not accept several forms of photo ID permitted under the Wisconsin law the Court considered last week.* For ex-

———————
*The District Court enjoined Wisconsin from implementing the law, the Seventh Circuit stayed the District Court's injunction, and in turn,

ample, Wisconsin's law permits a photo ID from an in-state four-year college and one from a federally recognized Indian tribe. Texas, under Senate Bill 14, accepts neither. Nor will Texas accept photo ID cards issued by the U. S. Department of Veterans' Affairs. Those who lack the approved forms of identification may obtain an "election identification certificate" from the Texas Department of Public Safety (DPS), but more than 400,000 eligible voters face round-trip travel times of three hours or more to the nearest DPS office. Op. 18, 76. Moreover, applicants for an election identification certificate ordinarily must present a certified birth certificate. *Id.,* at 70. A birth certificate, however, can be obtained only at significant cost—at least $22 for a standard certificate sent by mail. *Id.*, at 22. And although reduced-fee birth certificates may be obtained for $2 to $3, the State did not publicize that option on DPS's Web site or on Department of Health and Human Services forms for requesting birth certificates. *Id.*, at 70.

On an extensive factual record developed in the course of a nine-day trial, the District Court found Senate Bill 14 irreconcilable with §2 of the Voting Rights Act of 1965 because it was enacted with a racially discriminatory purpose and would yield a prohibited discriminatory result. The District Court emphasized the "virtually unchallenged" evidence that Senate Bill 14 "bear[s] more heavily on" minority voters. *Id.,* at 133. In light of the "seismic demographic shift" in Texas between 2000 and 2010, making Texas a "majority-minority state," the District Court observed that the Texas Legislature and Governor had an evident incentive to "gain partisan advantage by suppressing" the "votes of African-Americans and Latinos." *Id.,* at 40, 48, 128. Cf. *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 438–442

————————

this Court vacated the Seventh Circuit's stay. See *Frank* v. *Walker*, *ante,* p. 1.

(2006) (Texas Legislature acted with a "troubling blend of politics and race" in response to "growing" minority participation). The District Court also found a tenuous connection between the harms Senate Bill 14 aimed to ward off, and the means adopted by the State to that end. Between 2002 and 2011, there were only two in-person voter fraud cases prosecuted to conviction in Texas. Op. 13–14. Despite awareness of the Bill's adverse effect on eligible-to-vote minorities, the Texas Legislature rejected a "litany of ameliorative amendments" designed to lessen the Bill's impact on minority voters—for example, amendments permitting additional forms of identification, eliminating fees, providing indigence exceptions, and increasing voter education and funding—without undermining the Bill's purported policy justifications. *Id.,* at 35–37, 132 144–147. Texas did not begin to demonstrate that the Bill's discriminatory features were necessary to prevent fraud or to increase public confidence in the electoral process. *Id.,* at 133; see also *Id.,* at 113 (proponents of Bill unable to "articulate any reason that a more expansive list of photo IDs would sabotage" their efforts at detecting and deterring voter fraud). On this plain evidence, the District Court concluded that the Bill would not have been enacted absent its racially disparate effects. *Id.,* at 133.

The District Court further found that Senate Bill 14 operates as an unconstitutional poll tax—an issue neither presented by any of the recent applications nor before the Court in *Crawford* v. *Marion County Election Bd.*, 553 U. S. 181 (2008) (upholding Indiana voter identification law against facial constitutional challenge). See *Id.,* at 186, and n. 4. Under Senate Bill 14, a cost attends every form of qualified identification available to the general public. Op. 140. Texas tells the Court that any number of incidental costs are associated with voting. But the cost at issue here is one deliberately imposed by the State. Even at $2, the toll is at odds with this Court's precedent. See

*Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663 (1966). And for some voters, the imposition is not small. A voter whose birth certificate lists her maiden name or misstates her date of birth may be charged $37 for the amended certificate she needs to obtain a qualifying ID. Texas voters born in other States may be required to pay substantially more than that. Op. 71–74.

The potential magnitude of racially discriminatory voter disenfranchisement counseled hesitation before disturbing the District Court's findings and final judgment. Senate Bill 14 may prevent more than 600,000 registered Texas voters (about 4.5% of all registered voters) from voting in person for lack of compliant identification. *Id.,* at 50–51, 54. A sharply disproportionate percentage of those voters are African-American or Hispanic. *Ibid.*

Unsurprisingly, Senate Bill 14 did not survive federal preclearance under §5 of the Voting Rights Act. A three-judge District Court unanimously determined that the law would have a prohibited discriminatory effect on minority voters. See *Texas* v. *Holder*, 888 F. Supp. 2d 113, 115, 138 (DC 2012) (Tatel, J.). Although this Court vacated the preclearance denial in light of *Shelby County* v. *Holder*, 570 U. S. ___ (2013), racial discrimination in elections in Texas is no mere historical artifact. To the contrary, Texas has been found in violation of the Voting Rights Act in every redistricting cycle from and after 1970. Op. 7. See, *e.g., Texas* v. *United States*, 887 F. Supp. 2d 133 (DC 2012) (Griffith, J.). The District Court noted particularly plaintiffs' evidence—largely unchallenged by Texas— regarding the State's long history of official discrimination in voting, the statewide existence of racially polarized voting, the incidence of overtly racial political campaigns, the disproportionate lack of minority elected officials, and the failure of elected officials to respond to the concerns of minority voters. Op. 3–13, 122–126, 144–147.

The greatest threat to public confidence in elections in

this case is the prospect of enforcing a purposefully dis-
criminatory law, one that likely imposes an unconstitu-
tional poll tax and risks denying the right to vote to hun-
dreds of thousands of eligible voters.  To prevent that
disenfranchisement, I would vacate the Fifth Circuit's stay
of the permanent injunction ordered by the District Court.