[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11595
_____

D.C. Docket No. 1:12-cv-20700-MGC

ANTHONY RODRIGUEZ,

Plaintiff-Appellant,

versus

CITY OF DORAL,
JUAN CARLOS BERMUDEZ,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 19, 2017)

Before JORDAN, ROSENBAUM, and SILER,[*] Circuit Judges.

ROSENBAUM, Circuit Judge:

_____

[*] The Honorable Eugene E. Siler, Jr., United States Court of Appeals for the Sixth Circuit, sitting by designation.

"A wise man once said a true history of the world is a history of great conversations in elegant rooms."[1]    Whether or not that may be accurate, a true history of the United States would be incomplete without a history of great political conversations, wherever they might have occurred.  And great political conversations could not exist in the absence of the First Amendment.  So the First Amendment generally prohibits government retaliation against a person for exercising his rights to free speech and association, including supporting the political party and candidates of his choice.

In this case, Plaintiff-Appellant Anthony Rodriguez, who was employed as a police officer with Defendant-Appellee City of Doral, alleges that Doral and its mayor, Defendant-Appellee Juan Carlos Bermudez, arranged for Rodriguez's termination because Rodriguez dared to support Bermudez's purported political enemy, City of Doral Councilwoman Sandra Ruiz.  Based on this contention, Rodriguez filed suit under 42 U.S.C. § 1983, claiming violation of his First Amendment rights.

Though the district court concluded that Rodriguez had engaged in protected activity, it nonetheless granted summary judgment for Doral and Bermudez.  In the district court's view, Rodriguez had not suffered an adverse employment action

---

[1] Tyrion Lannister, speaking of himself.  "Oathbreaker," *Game of Thrones* (2016), *as quoted by* http://m.imdb.com/title/tt4131606/quotes?item=qt2914807 (last visited June 20, 2017).

because he had voluntarily left his position with Doral when he agreed to resign instead of being fired.

Though we agree with much of the district court's analysis, we ultimately conclude that Rodriguez did not voluntarily leave his employment with Doral but rather was effectively terminated. For this reason, we now reverse the entry of summary judgment for Defendants and remand for further proceedings.

# I.[2]

## A. The City of Doral

The City of Doral is situated in Miami-Dade County and lies one mile from Miami International Airport. https://www.cityofdoral.com/about/ (last visited June 20, 2017). A relative newcomer to independent city status, Doral was incorporated as a municipality in 2003.

In 2007, Doral decided to create its own police department. Towards this end, it hired Ricardo Gomez as its first chief of police. Gomez served as the chief during the events that occurred in this case.

---

[2] Defendants in this case contest some of the facts as set forth in this section. But for purposes of our review of the summary-judgment order, we must accept the facts as the plaintiff portrays them, to the extent that a reasonable jury could find that evidence in the record supports those alleged facts. *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011). We likewise must make "all justifiable inferences" from the facts in the plaintiff's favor. *Id.* For this reason, we do not identify the facts that Defendants controvert where sufficient evidence exists in the record to allow a reasonable jury to accept Rodriguez's version.

In order to gear up to become operational, the Doral Police Department needed to hire officers for its police force. So in January 2008, Doral offered and Plaintiff-Appellant Anthony Rodriguez accepted a position with Doral's Police Department. During his tenure with Doral, Rodriguez served as a detective.

At first, things at the Doral Police Department went along uneventfully for Rodriguez. But at some point during his service with Doral, Rodriguez began having difficulties with Gomez—difficulties that Rodriguez attributes to retaliation against Rodriguez for exercising his First Amendment rights.

B.  The Political Backdrop

Before discussing the nature of Rodriguez's problems with Gomez, we pause to provide some background on the alleged intrigue surrounding Doral's local politics and Rodriguez's involvement in them. Rodriguez first met Sandra Ruiz when he was employed as a police officer for the City of Hialeah. At the time, Ruiz was a member of the Doral City Council, and she encouraged Rodriguez to apply for employment with Doral. Before applying, though, Rodriguez decided to spend some time learning about how things operated in the City of Doral, so he began attending Doral City Council meetings. Over time, he developed a friendship with Ruiz and would walk in public with her to her office.

During this period, Defendant-Appellee Juan Carlos Bermudez served as Doral's mayor. Rodriguez asserts that Bermudez and Diaz were "political

4

enemies." In support of this contention, Rodriguez notes that Ruiz is a Democrat, while Bermudez is a Republican. And when Ruiz ran for election to the State house and later for the Doral City Council, Bermudez supported her opponent on both occasions.

Returning to Rodriguez, after Rodriguez began to work for Doral, his friendship with Ruiz grew into a political affinity for her as well. As a result, Rodriguez volunteered his time for Ruiz and attended public and private gatherings with her or for her. He also educated her about issues of importance to law-enforcement officers and prepared her to speak informedly about law-enforcement matters at City Council meetings. Rodriguez did these things because he knew that Ruiz intended to run for mayor at some point, and he wanted to support her in that endeavor.

C.  The Alleged Plan to Target Rodriguez

Not everyone appreciated Rodriguez's relationship with Ruiz. In fact, Rodriguez points to several pieces of evidence to show that Bermudez had a problem with Rodriguez because of Rodriguez's association with Ruiz.

First, Doral's city manager, Sergio Purrinos, informed Rodriguez that Bermudez had told Purrinos not to hire Rodriguez because Bermudez "did not want . . . Ruiz having a friend in the police department."

Second, Doral Police Department Commander James Montgomery attested that he overheard a conversation between Bermudez and Gomez in which Bermudez said in a "very loud, very angry tone" that Gomez "needed to deal with this 'asshole Tony,'" or Bermudez would. When Montgomery asked Gomez about the conversation, Gomez said, "The Mayor wants me to get rid of somebody." So Montgomery asked Gomez whether grounds existed to terminate the employee, and Gomez responded, "Well it doesn't matter; I'll take care of the situation." In a different conversation between Montgomery and Gomez, Gomez told Montgomery that Bermudez and Gomez believed that Rodriguez "was passing information to a city council member." Based on these discussions, Montgomery warned Rodriguez that "he was being targeted."

Third, Rodriguez relies on information that Clemente Vera, a friend of Bermudez's, had given him. Vera told Rodriguez that Bermudez advised that he was "giving Tony a hard time because he's associated with Sandra Ruiz."

Fourth, Rodriguez recalled a conversation he had with Gomez during which Gomez referred to himself as "an evil person and that [Rodriguez] did not want to see the evil side of him." During this same discussion, Rodriguez said, Gomez warned Rodriguez, "It's your responsibility to be loyal to me and the mayor, and no one else." In addition, Gomez explained that Gomez did not want Rodriguez fired, but Bermudez did.

6

Fifth, Doral Police Department Lieutenant Alfaro opined to Rodriguez that "the targeting" was "because of [Rodriguez's] association with Sandra Ruiz."

And sixth, Doral Councilman Pete Cabrera advised Rodriguez of a conversation he had heard between Gomez and Bermudez. According to Cabrera's deposition testimony, the conversation occurred in July 2008, after Bermudez picked up Cabrera in his car. As Cabrera entered the car, he heard Bermudez having "a very loud, hostile phone conversation" with someone. Since Cabrera caught only the end of it, he asked Bermudez what the call was about. Bermudez explained that he was speaking with Gomez about Rodriguez, whom Bermudez described as "[Ruiz's] spy in the police department and . . . the one that gets her all her information."

But Bermudez had a plan for dealing with the situation, Cabrera testified. He instructed Gomez that "[Gomez] better put an F ending to [Rodriguez] or [Bermudez] w[ould]." Then Bermudez continued, characterizing Ruiz as "an evil person" and vowing that if she ran for a higher office, "he would make it his personal mission in life to destroy her."

D. The Alleged Targeting of Rodriguez

As proof that the "targeting" was not just talk, Rodriguez relies on four incidents where he alleges he was, in fact, "targeted."

7

The first two incidents involve investigations that resulted in what Rodriguez describes as bogus disciplinary action against him. Of these, the first concerned Rodriguez's alleged unauthorized use of his police vehicle for personal business on the way home from work. At Gomez's direction, Rodriguez's direct supervisor, Sergeant George Gulla, investigated the incident to determine whether Rodriguez had violated City policy. Gulla determined that Gomez had authorized Rodriguez to stop at a fitness center on his way home and that Rodriguez had complied with Department policy by locking his weapons and other valuables in his police vehicle while he worked out.

Gomez did not agree with Gulla's conclusion. So he instructed Gulla to change the outcome of the report to find that Rodriguez had violated City policy. Against his will, Gulla did so. Rodriguez received written counseling as a result of the incident.

In his capacity as the Internal Affairs investigator, Gulla also conducted the second investigation. Rodriguez was accused of having used "improper procedure" by interfering with a Miami-Dade Police investigation. But after a "complete investigation," Gulla concluded that insufficient evidence existed to sustain the allegations against Rodriguez. So Gulla prepared a report to this effect and sent it to Gomez. But once again, Gomez took issue with Gulla's report and

8

ordered Gulla to reverse his findings and find Rodriguez "guilty of some policy violation." And once again, against his will, Gulla did so.

The third alleged targeting incident concerned Rodriguez's December 2008 performance evaluation. Gulla attested that he prepared an evaluation that initially gave Rodriguez 38 or 39 points out of a possible score of 40. Before the evaluation became final, however, Gomez instructed Gulla to remove the narrative portion of the evaluation describing Rodriguez as "an asset" to the Doral Police Department and to lower Rodriguez's score to 34, which was the minimum score that would still allow Rodriguez to receive a raise. Gomez provided Gulla with no specific or objective justification for the changes.

The ultimate alleged targeting incident occurred on January 29, 2009, when Rodriguez was instructed to go to Gomez's office. When Rodriguez arrived, Gomez, Gulla, and Alfaro were present. Gomez gave Rodriguez a letter terminating Rodriguez's employment "effective immediately." The letter offered no reason for the termination. And though Doral's human-resources director, Jorleen Aguiles, was copied on the letter, she declined to be involved in the termination process because Gomez refused to disclose to Aguiles any reason for Rodriguez's termination.

Nor would Gomez give Rodriguez a reason for his termination when Rodriguez asked. Instead, Gomez said, "I don't have to give you a reason. This is

9

an at-will police department. I didn't sign the termination letter; the city manager signed the letter."

After Gomez informed Rodriguez that he was fired, he then offered Rodriguez the option to resign instead, allowing Rodriguez five minutes to leave the room to think about it. Rodriguez used the time to call the Police Benevolent Association ("PBA"). A staff attorney advised Rodriguez that "it would be easier to obtain future employment with a resignation on [his] record instead of a termination."

Rodriguez returned to Gomez's office and after a short time, was presented with a resignation letter that Doral had prepared.[3] Rodriguez, who was "very upset and distraught," began crying and signed the letter under what he describes as "duress." At that time, Rodriguez thought he had no choice. On the day of the termination, Alfaro opined to Rodriguez that Rodriguez's termination was "politically motivated and . . . above [Alfaro's] payscale."

About an hour later, Rodriguez called the PBA again. This time counsel instructed Rodriguez to prepare a letter rescinding his resignation letter and fax it to the city manager, so he did. But after Rodriguez submitted it, he received a

---

[3] The resignation letter stated, "Effective Immediately, I hereby resign from my position as Police Officer for the City of Doral Police Department. I would like to take this time to express my appreciation for the opportunity given to me to serve the City of Doral."

letter from City Manager Yvonne Soler-McKinley denying his request to rescind his letter of resignation.

Rodriguez attempted to appeal his termination under Doral's procedures. Though Rodriguez sent letters to Gulla, Gomez, and Soler-McKinley, Doral denied all requests to allow him to appeal the termination.

## II.

When Rodriguez's efforts to appeal his termination came to naught, Rodriguez filed this case under 42 U.S.C. § 1983, alleging that Doral and Bermudez violated his First Amendment rights by unlawfully retaliating against him and terminating his employment after he began "actively and prominently supporting" Ruiz. In particular, Rodriguez claimed that Bermudez instructed Gomez and Soler-McKinley to terminate him because of his political association with Ruiz.

Following discovery, Bermudez and Doral each moved for summary judgment. The district court granted the motions. Though the district court concluded that Rodriguez's conduct was constitutionally protected and that dismissal of Rodriguez for reasons of his political affiliation would have violated Rodriguez's First and Fourteenth Amendment Rights, it ultimately determined that Rodriguez's § 1983 retaliation claim failed. In the district court's view, Rodriguez

11

had voluntarily resigned his position, so he could not establish an adverse employment action in his retaliation claim.

Following the entry of summary judgment, Rodriguez filed a motion for reconsideration under Rule 59(e), Fed. R. Civ. P.  In support of his motion, Rodriguez first asserted that the district court had resolved a material issue of fact improperly against him in concluding that Rodriguez had voluntarily resigned his position.  And second, Rodriguez contended that the district court erred as a matter of law when it determined that he did not suffer an adverse employment action. The district court denied the motion for reconsideration.

Rodriguez now appeals both the entry of summary judgment and the denial of the motion for reconsideration.

### III.

We review de novo the district court's grant of summary judgment, drawing all inferences and reviewing all evidence in the light most favorable to the non-moving party.  *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012); *Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008).  We do not make credibility determinations or choose between conflicting testimony. *Bozeman v. Orum*, 422 F.3d 1265, 1267-68 (11th Cir. 2005) (per curiam), *abrogated on other grounds by Kingsley v. Hendrickson*, __ U.S. __, 135 S. Ct.

2466 (2015).  A district court should grant summary judgment only if the movant establishes the absence of a genuine issue of material fact.  *Id.*

As for the district court's denial of Rodriguez's motion for reconsideration, we review that for an abuse of discretion.  *Richardson v. Johnson*, 598 F.3d 734, 740 (11th Cir. 2010) (per curiam).  A court abuses its discretion if it incorrectly applies the law.  *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1218 (11th Cir. 2000).

## IV.

"The First Amendment protects political association as well as political expression."  *Elrod v. Burns*, 427 U.S. 347, 357 (1976) (plurality opinion) (quoting *Buckley v. Valeo*, 424 U.S. 1, 11 (1976) (alteration omitted)).  As the Supreme Court has explained, "[F]reedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments."[4]  *Id.* (citations and internal quotation marks omitted).  And a person's right to associate with the political party of his choice is "an integral part of this basic constitutional freedom."  *Id.* (citation and internal quotation marks omitted).

To ensure that public employees enjoy their right to freedom of political association, the Supreme Court has held that a government may not fire a public

---

[4] The Fourteenth Amendment incorporates the First Amendment's limitations and makes them applicable to Defendants.  *See Elrod*, 427 U.S. at 356 n.10.

13

employee solely because of his political association or beliefs unless "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980); *see also Elrod*, 427 U.S. at 362 (plurality opinion); *id.* at 375 (Stewart, J., concurring); *McKinley v. Kaplan*, 262 F.3d 1146, 1149 (11th Cir. 2001) (citing *McCabe v. Sharrett*, 12 F.3d 1558, 1565-67 (11th Cir. 1994)).

Here, whether Rodriguez's political beliefs or his party affiliation is "an appropriate requirement for the effective performance" of Rodriguez's duties is not at issue;  the parties agree that these considerations are irrelevant to Rodriguez's ability to properly execute his responsibilities as a Doral police detective.  So we must determine whether Rodriguez presented sufficient evidence to allow a reasonable jury to conclude that Defendants terminated or constructively discharged him because of his political affiliation with Councilwoman Ruiz, in violation of Rodriguez's First and Fourteenth Amendment rights.

To prevail on a First Amendment political-association claim, a plaintiff must show that (1) he engaged in constitutionally protected political affiliation or held constitutionally protected political beliefs, and (2) his protected conduct was a "substantial or motivating factor" in the decision to take adverse action against the plaintiff. *Holley v. Seminole Cty. Sch. Dist.*, 755 F.2d 1492, 1500 (11th Cir. 1985) (citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  If the

plaintiff meets these requirements, the burden shifts to the employer, who must demonstrate by a preponderance of the evidence that it would have made the same employment decision, even had the plaintiff never engaged in the protected conduct. *Id.* (citing *Mt. Healthy*, 429 U.S. at 287; *Paschal v. Fla. Pub. Emp't Relations Comm'n*, 666 F.2d 1381, 1384 (11th Cir.), *cert. denied*, 457 U.S. 1109 (1982)).

The first element—whether Rodriguez participated in constitutionally protected activity—is not at issue in this appeal. The district court found that he did, and the parties do not dispute this determination.

Rather, the district court rested its entry of summary judgment for Defendants on its finding that Rodriguez had failed to establish part of the second element of his retaliation claim: that he had suffered an adverse employment action. Of course, termination constitutes an adverse employment action. *McCabe*, 12 F.3d at 1563. But in Defendants' and the district court's view, Rodriguez voluntarily resigned, so he was not terminated. We respectfully disagree.

Rodriguez offers three alternative arguments to show that he endured an adverse employment action. First, he claims that his employment was terminated "effective immediately" when Gomez handed him the termination letter. Second, Rodriguez argues that since he was an "at-will" employee, he had no alternative

15

but to resign since he would have been fired, anyway, and had no choice to fight for his job. And third, Rodriguez asserts that he tendered his resignation under duress, so it was not voluntary.

We first consider Rodriguez's argument that he was terminated instantly upon receipt of the termination letter. Rodriguez recounts that when he reported to Gomez's office on January 29, 2009, Gomez handed him a letter that stated, "Please be advised that effective immediately, your employment with the City of Doral is hereby terminated." Rodriguez argues that, as of that moment, Defendants terminated his employment, and the fact that he later had the option to resign does not alter the fact that he had already been fired, "effective immediately" upon receipt of the letter.

We are not persuaded. This theory requires us to ignore everything that happened after Rodriguez received the letter of termination. And as we know, after Gomez conveyed the letter to Rodriguez, the parties discussed the possibility of resignation.[5] Rodriguez ultimately signed a letter stating that he was resigning, and Doral accepted Rodriguez's resignation, effectively withdrawing the letter of

_____

[5] Rodriguez asserts that the district court improperly chose between two plausible versions of the facts, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, (1986), by concluding that Rodriguez—as opposed to Gomez—suggested the option to resign. In fact, though, the district court expressly did not determine who suggested resignation because it found the issue to be immaterial to resolution of Rodriguez's claim. As the district court stated, "Rodriguez had a choice between termination and resigning. It does not matter who suggested the options, which is subject to dispute. It matters only that Rodriguez had an alternative to resigning." We agree that who suggested resignation is irrelevant. We consider only whether Rodriguez chose to resign of his own free will. *See infra* at Section IV.

16

termination. As a matter of fact, then, the record does not bear out Rodriguez's contention that he was actually terminated when he received the termination letter.[6]

Instead, the events that happened after Gomez gave Rodriguez the termination letter necessarily raise the question of whether, under the circumstances, Rodriguez's resignation was voluntary, an issue that both of Rodriguez's two remaining theories implicate. We therefore address both of these theories together, below.

If Rodriguez's resignation was voluntary—even though triggered by Defendants' actions—Rodriguez cannot show that he suffered an adverse employment action and cannot prevail on his First Amendment unlawful-

---

[6] Our colleague suggests that the words "effective immediately" in the termination letter in and of themselves create an issue of fact concerning whether an involuntary termination occurred at the time Gomez originally handed him the termination letter. *See* J. Jordan Opinion at 24. We respectfully disagree. First, Judge Jordan's concurrence states that "[t]he majority says that everything that happened after Mr. Rodriguez was given the letter by Chief Gomez (including Mr. Rodriguez's subsequent decision to resign) shows that the letter did not constitute a termination." *Id.* at 25. To be clear, though, that is not our position. Rather, we conclude only that we cannot tell by looking at the letter alone whether Rodriguez's termination was involuntary under our caselaw. Judge Jordan's concurrence suggests that the words "effective immediately" in the termination letter, in and of themselves, are enough to involuntarily end employment, regardless of all surrounding events. We think not. No magic words alone can tell us whether a termination was voluntary or involuntary. Rather, as we discuss above, caselaw teaches that we must look to the context of what occurred. That, in turn, requires us to consider Rodriguez's second and third arguments for why his termination was involuntary. We also respectfully disagree with Judge Jordan's concurrence for another reason. He suggests that under Rodriguez's version of events, Gomez possibly may not have had authority from the city manager when he offered Rodriguez the option to resign. But Rodriguez never argued that Gomez may not have had authority to offer resignation after delivering the letter to Rodriguez. While we certainly view the evidence in favor of the non-moving party and draw all reasonable inferences from that evidence, we are not the non-moving party's lawyer; Defendants have never had the opportunity to confront this new argument; and the district court never had the chance to consider it. So we cannot conclude that summary judgment was wrongly entered on the basis of an argument that Rodriguez never made.

retaliation claim.  *See Hargray v. City of Hallandale*, 57 F.3d 1560, 1567 (1995) (discussing the implications of voluntary resignation in the context of a due-process claim).  But if Rodriguez has presented sufficient evidence to allow a reasonable jury to conclude that his resignation "was so involuntary that it amounted to a constructive discharge," *id.* (citation and quotation marks omitted), Rodriguez satisfies the second element of his retaliation claim.

We have not previously identified the appropriate standard for determining the voluntariness of a public employee's resignation where a claim of First Amendment retaliation is involved.  But we can see no reason why the test for voluntariness that applies in the context of due-process claims would not also apply in the context of First Amendment claims.

Under the due-process voluntariness framework, we presume that a resignation is voluntary unless the employee points to "sufficient evidence to establish that the resignation was involuntarily extracted." *Id.* at 1568 (citation and quotation marks omitted).  Two situations warrant deeming an employee's resignation involuntary: "(1) where the employer forces the resignation by coercion or duress; or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee." *Id.* (citations omitted).

Rodriguez relies on the first of these two methods to show that his resignation was not voluntary; he contends that he was under duress, and

18

Defendants coerced him to resign.  To evaluate Rodriguez's claims of duress and coercion, we take into account "whether, under the totality of the circumstances, [Defendants'] conduct in obtaining [Rodriguez's] resignation deprived [Rodriguez] of free will in choosing to resign." *Id.*  We have identified a non-exhaustive list of five factors to guide our analysis into this inquiry:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.

*Id.* (citations omitted).

When we speak of the first factor—whether the employee was given some alternative to resignation—we are talking about whether the employee had any "real alternatives" to termination, a determination we measure by an objective standard.  *See id*.  That an alternative may be "comparably unpleasant" to termination does not, in and of itself, render that option something less than a "real alternative."  Indeed, we have recognized that "resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges."  *Id.*  Nevertheless, we have been careful to note that a resignation is not voluntary "where the employer actually lacked good cause to believe that grounds for the termination and the criminal charges existed."  *Id.*

19

*Hargray* provides a good illustration of what we mean by a "real alternative." And it also shows how the other enumerated factors bear on the assessment of whether an alternative qualifies as a "real alternative."

In *Hargray*, Hargray, a city employee, faced a choice between termination in the midst of a corresponding criminal investigation of him, and resignation. If he chose resignation, the criminal investigation would be closed and the city would instead administratively handle Hargray's alleged wrongdoing. We determined that these circumstances presented Hargray with a real alternative to termination. In reaching this conclusion, we found certain facts particularly important.

First, Hargray knew for weeks that he was being investigated, and he received advance notice of the charges that might be brought against him. *Id.* at 1569.

Second, these circumstances gave Hargray an opportunity to "think long and hard" about his possible alternatives: he had time to decide whether he would agree to go to the police station for questioning, whether he would answer questions, whether he would resign if asked to do so, or whether he would "'stand pat and fight,' even if it meant criminal charges being pressed." *Id.*

Third, though Hargray had to make his decision to resign under time pressure and he did so without counsel, we observed that the circumstances under which Hargray signed his resignation at the police station were, nonetheless, not

20

coercive:  Hargray was free to leave; he knew the charges against him; he knew the sources of the allegations; he never asked for more time or to speak with his supervisor or an attorney; and a transcript of Hargray's interaction with the police at that time revealed a "casual atmosphere, during which Hargray at times even laughed with the police." *Id.* at 1570.

And fourth, we noted that good cause supported the city's criminal proceedings against Hargray. *Id.*  So when Hargray chose to resign, he received a substantial benefit as a result of his decision:  the city agreed to cease pursuing viable criminal proceedings against him.

Unlike Hargray, Rodriguez had no "real alternatives" to termination.  In contrast with Hargray, Rodriguez was accused of no wrongdoing, so resignation did not save him from investigation or criminal proceedings.  In fact, Gomez refused to tell Rodriguez at all why he was being fired, so Rodriguez could not even challenge the basis for his termination.

And while Defendants suggest that, had Rodriguez elected not to resign, he could have appealed his termination, it's difficult to imagine how when he was not told why he was being terminated.  But even setting aside this practical problem, as a matter of fact, Doral's Employee Policies and Procedures Manual renders Doral's appeal process applicable to only employees who are terminated for violating the Employee Code of Conduct.  Rule 9.5 of Chapter IX of the Manual

sets forth the procedure for terminated employees who may take advantage of the appeal process. It states, "The dispute resolution procedure is a mechanism to resolve *disciplinary actions* taken against an employee in the Municipal Service." (Emphasis added). When an employee is not fired for cause, termination is not disciplinary in nature. So because Rodriguez was not fired for violating Doral's Code of Conduct, the appeal process does not appear to have applied to Rodriguez at all.

The rest of the circumstances surrounding Rodriguez's submission of his resignation only confirm that his resignation was not voluntary. Unlike Hargray, who had weeks to consider how to deal with a potential termination, Rodriguez did not learn of his firing until the moment that he received his letter of termination. Then he had a mere five minutes to agree to submit his resignation—a letter that Doral wrote—or accept his termination. And while Rodriguez testified at his deposition that he spoke with staff counsel at the PBA in those five minutes before signing the letter of resignation, under the circumstances of this case, five minutes was simply not enough to allow Rodriguez to explain his situation to counsel and permit counsel to make a reasoned evaluation. Nor was it sufficient to overcome the coercive atmosphere and other circumstances that precipitated Rodriguez's signing of the letter of resignation. Indeed, were we to conclude otherwise, we would essentially be holding that virtually no circumstances short of physical

22

threats or force would suffice to rebut the presumption of voluntariness when an employee submits a resignation. But that is not the law: the law requires us to determine instead whether the employee's resignation could objectively be said to be a product of the employee's free will. Because a reasonable jury could conclude that Rodriguez's resignation was not, we find that Rodriguez presented sufficient evidence to establish that he suffered an adverse employment action when his employment with Doral ended abruptly on January 29, 2009.

## V.

For these reasons, we vacate the judgment for Defendants-Appellees and remand this matter to the district court for further proceedings.

**VACATED and REMANDED**.

JORDAN, Circuit Judge, concurring:

I agree that there is an issue of material fact as to whether Mr. Rodriguez suffered an adverse employment action, and generally concur in the majority's discussion of why that is so.  But I would not be so quick to dismiss the termination letter that Chief Gomez handed to Mr. Rodriguez on January 29, 2009.

"[T]he issue of whether an actual termination has occurred is determined in light of the particular circumstances of the controverted job action." *Thomas v. Dillard Dept. Stores, Inc.*, 116 F.3d 1432, 1434 (11th Cir. 1997). The first paragraph of the letter, signed by the City Manager, was unmistakably direct and unqualified: "Please be advised that effective immediately, your employment with the City of Doral is hereby terminated."  D.E. 85-3.  In Doral the City Manager has the power to hire and fire, *see* D.E. 87-1 at 22, and when an employer tells an at-will employee that he is discharged "effective immediately," that can only be understood by a reasonable person to mean that employment is over the instant the decision is communicated.  *See, e.g.,* The American Heritage Dictionary of the English Language 877 (4th ed. 2009) (defining "immediately" as "without delay"). At the very least, a reasonable jury could find that the delivery of the letter ended Mr. Rodriguez's job.  *Cf. Brantley v. Smith*, 400 So. 2d 443, 444 (Fla. 1981) ("a public officer's resignation, stated to be effective immediately, is effective upon submission to the proper authority").  And if the letter terminated his employment

24

with the City, how could Mr. Rodriguez subsequently resign from a non-existent position?

The majority says that everything that happened after Mr. Rodriguez was given the letter by Chief Gomez (including Mr. Rodriguez's subsequent decision to resign) shows that the letter did not constitute a termination. *See* Maj. Op. at 17–19. I am not sure, however, that we can make such a blanket determination on this record and would allow the jury to decide the effect of the letter.

According to the City, Mr. Rodriguez requested the option of resigning instead of being terminated, and once he chose resignation, Chief Gomez called the City Manager and obtained approval for the resignation. *See* D.E. 97-7 at 11; D.E. 83-2 at ¶ 13; D.E. 82 at ¶¶ 29-30. But Mr. Rodriguez had a different version of events. Mr. Rodriguez testified that he did not make the initial request to resign, and that it was Chief Gomez who offered him the option of resigning right after handing him the termination letter, apparently without seeking or obtaining the City Manager's approval. *See* D.E. 122-1 at 4 ("He then gave me the option to either resign or to be terminated. He gave me five minutes to think about it."); D.E. 97-1 at ¶ 15 ("After having terminated me, Chief Gomez gave me the option to resign instead and gave me five minutes to go out and think about it.").

At summary judgment, we have to accept Mr. Rodriguez's version of events, as well as the reasonable inferences that can be drawn from it, so I do not think it is

25

possible to say definitively that Chief Gomez had the City Manager's approval when he offered Mr. Rodriguez the option of resigning.  If a jury were to find that Chief Gomez did not have the City Manager's blessing, then maybe everything that took place after the delivery of the letter to Mr. Rodriguez was just "sound and fury, [s]ignifying nothing."  William Shakespeare, The Tragedy of McBeth, Act V, scene 5 (1606).