[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16083
Non-Argument Calendar
_____

D.C. Docket No. 2:15-cv-00803-VEH-HGD

ROY M. RUTLEDGE,

Plaintiff - Appellant,

versus

STATE OF ALABAMA,
KIM THOMAS,
in his former individual and official capacities as
Commissioner for the Alabama Department of Corrections,
COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,
in his current official capacity as Commissioner for the
Alabama Department of Corrections,
WILLIE THOMAS,
in his individual and official capacities as Warden of
Bibb County Correctional Facility,
CORRECTION MANAGEMENT SERVICE,
(CMS),
a.k.a. Corizon, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(February 5, 2018)

Before JORDAN, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Roy Rutledge ("Plaintiff") suffered multiple stab wounds in his right knee, right arm, and back after he was attacked in prison. In the following years, Plaintiff suffered from lingering issues of pain and weakness, particularly in his knee. Despite receiving continual medical treatment following the attack, Plaintiff filed this lawsuit under 42 U.S.C. § 1983 claiming that both the prison staff and the private medical services company responsible for his care violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs. But, because Plaintiff has received treatment for his injuries since the date he was injured onward and cannot establish that such treatment was grossly inadequate, the district court granted summary judgment to the defendants because Plaintiff

2

could not establish a violation of his Eighth Amendment rights.  We agree and **AFFIRM**.[1]

## I.    Background

### A.    Factual Background

On August 27, 2013, Plaintiff was attacked in his cell at Bibb County Correctional Facility in Brent, Alabama, by two men with prison-made knives. Plaintiff fought off the men and, in the process, was stabbed in the back.  Plaintiff fled and sought help but was unable to locate the on-duty guard.  Knowing that he needed medical attention, Plaintiff ran through the prison yard to the infirmary.  As he entered the yard, Plaintiff was ambushed by the original two men and up to five others.  The attackers stabbed Plaintiff multiple times before a prison guard was able to intervene.  At that point, Plaintiff lost consciousness.

Plaintiff awoke later that day in the prison infirmary run by Corizon Health, Inc. (formerly Corrections Management Services)—a private medical services contractor that staffs and serves the prison infirmaries Plaintiff was treated in. Upon his arrival, a nurse treated and bandaged Plaintiff's wounds.  The nurse observed that Plaintiff had a two centimeter deep and three centimeter long laceration on his back, half centimeter deep lacerations on his right triceps and

---

[1]  We grant Plaintiff's motion to file his reply brief out of time.

right knee, a four centimeter long abrasion on his outer right knee, and other abrasions on his right forearm and right elbow along with swelling.  Although Plaintiff was not seen by a doctor at this time, his medical records indicate that, under Dr. James Whitley's orders, Plaintiff received a tetanus shot and prescriptions for Keflex (an antibiotic) and Naprosyn (a nonsteroidal anti-inflammatory drug).

The next day, August 28, Plaintiff was placed in administrative segregation away from the main prison population.  Dr. Whitley ordered that Plaintiff's wounds receive daily care until healed, and the nurses did precisely that.

On September 5, x-rays of Plaintiff's right knee, right tibia, and right fibula were taken.  Based on this, the radiologist found that there was "no radiographic evidence of acute disease" in any of the three locations.  On September 6, Plaintiff's medical notes indicate that he reported right knee pain, so Dr. Whitley ordered a right knee brace for Plaintiff and requested an MRI.  A nurse observed on September 9 that Plaintiff's wounds had healed, and he stopped receiving daily wound treatment.  On September 25, Plaintiff was ordered another prescription of Naprosyn along with right elbow x-rays.

Plaintiff was transferred from Bibb County Correctional Facility to Fountain Correctional Facility in Atmore, Alabama, on September 27.  Plaintiff saw a nurse

on October 2 and reported pain in his right knee and right elbow. The nurse noted that Plaintiff had bruising and swelling in his right knee and walked with a limp, but also observed that Plaintiff was not in acute distress. On October 15, Plaintiff's medical notes indicate that he was non-compliant with his treatment and had a "dysfunctional knee." Plaintiff was seen again the next day by Dr. Timothy Iliff. Dr. Iliff observed that Plaintiff's right knee was unstable and requested an MRI.

Plaintiff's right elbow was x-rayed on October 18. The radiologist concluded that there was "[n]o fracture or dislocation" and stated that "[i]f symptoms persist, recommend short-term followup."

By October 21, an MRI of Plaintiff's right knee had been scheduled with an outside radiology department for November 13. That MRI indicated that Plaintiff had a "[s]ubchondral impaction fracture of the medial femoral condyle with overlying subcutaneous edema" and "Grade II chondrosis of the lateral aspect of the patellofemoral joint." On November 14, Plaintiff saw a nurse and complained that he was experiencing pain in his right upper forearm, which the nurse recorded as a pulled muscle. The nurse also observed that Plaintiff was not in acute distress.

On December 17, Dr. Iliff requested Plaintiff receive an orthopedic evaluation for his right knee. By December 30, Plaintiff had an appointment

scheduled with outside orthopedic specialist Dr. George Corbett for January 2, 2014 (later rescheduled to January 14).

After meeting with Plaintiff, Dr. Corbett concluded that Plaintiff had a PCL tear in his right knee.  Dr. Corbett's recommended treatment was continued use of the knee brace, a steroid injection, and nonsteroidal anti-inflammatory drugs.  Dr. Corbett also indicated that he would follow up if Plaintiff did not improve.

On February 24, Dr. Iliff recommended a follow-up appointment with Dr. Corbett because Plaintiff continued to complain of instability and pain in his right knee.  Dr. Iliff also continued to prescribe Naprosyn.  By February 28, Plaintiff had a follow-up appointment scheduled with Dr. Corbett for March 20.

At the appointment, Dr. Corbett recommended PCL reconstruction surgery. Surgery was initially scheduled for April 14, but was rescheduled to May 7. Plaintiff, however, asked that surgery be pushed back again so he could attend his grandfather's funeral on May 7.  Accordingly, the surgery was moved to June 11.

Plaintiff underwent PCL reconstruction surgery on June 11.  Afterwards, Dr. Corbett instructed Plaintiff to continue wearing the knee brace, stop taking nonsteroidal anti-inflammatory drugs, ice his knee, and begin rehabilitative exercises.  Plaintiff attended a follow-up appointment on June 27 and was ordered

6

to start outside physical therapy.  Plaintiff was also prescribed Loritab.  Medical notes from that date indicate "no distress noted."

Plaintiff attended physical therapy sessions outside of the prison on July 11, July 17, and July 24.  Medical notes from July 30 indicate that Plaintiff was experiencing knee pain during his physical therapy along with swelling.  On August 8, Dr. Iliff requested another follow-up appointment with Dr. Corbett, which was eventually scheduled for August 29.

At the follow-up, Dr. Corbett recommended additional physical therapy. And Plaintiff attended those sessions on September 15, October 2, and October 9.

On February 2, 2015, Dr. Iliff put in a request for another follow-up with Dr. Corbett.[2]  On February 13, Plaintiff had another x-ray done on his right knee.  The x-ray revealed a new "[p]robable acute fracture in the proximal tibial metaphysis."

Plaintiff continued to complain of instability and pain in his right knee, including on February 25, March 3, March 24, and May 19.  Plaintiff continued to receive pain medications throughout this period without significant relief.  On July 29, Plaintiff was transferred to Elmore Correctional Facility.  On December 8, Plaintiff complained about problems with his leg and arm, that he was in pain all

---

[2] The record is unclear on whether this appointment was ever scheduled and whether Plaintiff ever met with Dr. Corbett again.

the time, and that he needed to see a doctor. Plaintiff was seen by a nurse the next day, who indicated that he was experiencing weakness and numbness in his right arm and hand, along with pain and instability in his right knee. Plaintiff also told the nurse that the only medicine that he believed had helped him was indomethacin. Plaintiff's indomethacin prescription was renewed shortly thereafter on December 15.

Despite his treatment, Plaintiff asserts that he still suffers from knee problems, permanent scarring, diminished vision in his right eye, difficulty using his right arm, migraine headaches, and numbness from nerve damage.

### B.    Procedural History

On May 5, 2015, Plaintiff filed this lawsuit under 42 U.S.C. § 1983 against the State of Alabama, former Alabama Prison Commissioner Kim Thomas, present Alabama Prison Commissioner Jefferson Dunn, Bibb County Correctional Facility Warden Willie Thomas, Corizon, and the nurses on duty on August 27, 2013 (named in the complaint as Jane and John Doe). Plaintiff asserted that the defendants had violated his Eighth Amendment rights by failing to adequately secure the prison (largely through understaffing), which resulted in his attack, and by failing to adequately treat his medical needs. The magistrate judge ordered the defendants to file special reports that were later construed as motions for summary

judgment.  Plaintiff opposed the motions, but the magistrate judge entered a report and recommendation that all claims be dismissed with prejudice.  Plaintiff conceded that his claim about the prison's insecurity was properly dismissed, but objected to the dismissal of his claim for inadequate medical care.  The district court adopted the magistrate judge's report and recommendation, concluded that Plaintiff had failed to show a genuine issue of material fact about the defendants' deliberate indifference to his medical needs, and dismissed his claims.  Plaintiff appealed the grant of summary judgment on his claim of inadequate medical care under 28 U.S.C. § 1291.[3]

## II.    Standard of Review

We review *de novo* a district court's grant of summary judgment and apply the same standards used by the district court.  *Acevedo v. First Union Nat'l Bank*, 357 F.3d 1244, 1246–47 (11th Cir. 2004).  We draw all inferences and review all evidence in the light most favorable to the nonmoving party.  *Rodriguez v. City of*

---

[3] On appeal, Warden Thomas, Commissioner Dunn, and the "ADOC Defendants" filed a notice that Plaintiff was not appealing the district court's order granting them summary judgment. Neither Plaintiff nor Corizon filed any objection to this, but it is unclear if that is in fact the case. Plaintiff's briefing refers separately to both Corizon and "the defendants," and discusses actions taken by Warden Thomas and the unnamed nurses.  And the district court order that Plaintiff is appealing from granted summary judgment to all the defendants, not just Corizon.  As a result, it is unclear who (aside from Corizon) Plaintiff is challenging the grant of summary judgment to. Because it does not alter the outcome of this appeal, and for clarity's sake, we use the phrase "the defendants" to refer to all defendants granted summary judgment on Plaintiff's inadequate medical care claim by the district court's August 30, 2016 order.

*Doral*, 863 F.3d 1343, 1349 (11th Cir. 2017).  Summary judgment should be granted only if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if "the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  *Waddell v. Valley Forge Dental Assoc., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  To be genuine, a factual issue "must have a real basis in the record."  *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993). "A mere scintilla of evidence in support of the nonmoving party will not suffice." *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

## III.    Discussion

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To establish an Eighth Amendment violation, a plaintiff must show:  "(1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016).

The district court held that Plaintiff could not establish deliberate indifference, and, as a result, could not prove a violation of his Eighth Amendment

10

rights. Deliberate indifference requires: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id.* at 1223. We have recognized that conduct that is more than mere negligence includes grossly inadequate care, administering easier but less effective treatment, treatment that is so cursory as to amount to no medical care at all, and, in certain situations, delaying necessary medical treatment. *See id.* at 1223–24. Importantly, a "difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment" does not constitute deliberate indifference. *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).

On appeal, Plaintiff contends that the defendants were deliberately indifferent to his serious medical needs by (1) providing him with inadequate care after his attack on August 27, 2013 (specifically, by not having a physician present, by not taking him to an outside hospital, and by not administering an MRI until after Plaintiff had received x-rays), (2) failing to perform knee surgery until roughly eight months after his attack, and (3) never adequately treating his right arm, back, and head injuries.

But, at best, Plaintiff cannot establish that this amounts to more than mere negligence or a difference in medical opinion—conduct insufficient to support

11

deliberate indifference.  There is simply no evidence, in either Plaintiff's medical records or his affidavits, that indicates his complaints or medical problems were ever ignored, that he was ever denied necessary treatment, or that his treatment was inadequate.

To the contrary, the record shows that Plaintiff received treatment for all of his injuries immediately after and in the years following his attack.  Plaintiff received daily treatments for his wounds, prescription medication, a knee brace, multiple x-rays, an MRI, multiple consultations with an outside orthopedic specialist, reconstructive knee surgery, multiple follow-up visits to the orthopedic specialist, and months of physical therapy and treatment.  Although Plaintiff has continued to suffer from knee problems and other issues, there is no evidence to suggest that the course of treatment he received was in any way inadequate or the cause of his current problems.

Indeed, Dr. Hugh Hood, Regional Medical Director for Corizon and a licensed physician, opined in his affidavit attached to Corizon's special report that Plaintiff "received necessary and appropriate medical care," that "[n]ecessary and appropriate care was never delayed or denied," and that "[e]ach time [Plaintiff] sought medical care for the issues related to the altercation which occurred on August 27, 2013, necessary and appropriate medical care was provided."  Hence,

12

Dr. Hood concluded that Plaintiff "at all times received necessary and appropriate medical care within the standard of care for physicians practicing medicine in the State of Alabama."

Although Plaintiff may personally believe that he should have been treated differently, his personal disagreement with the treatment administered by his nurses and doctors is "a classic example of a matter for medical judgment"—not a constitutional violation.  *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle*, 429 U.S. at 107).  Measured against the evidence from his medical records and Dr. Hood's affidavit, Plaintiff's conclusory allegations that his treatment was insufficient and that the defendants were deliberately indifferent to his medical needs do not create a genuine issue of material fact.  *See, e.g.*, *Bennett v. Parker*, 898 F.2d 1530, 1533–34 (11th Cir. 1990) (holding that a prisoner's self-serving "conclusory allegation, unsupported by any physical evidence, [or] medical records" about the seriousness of injury was insufficient to create a genuine issue of material fact when prisoner's medical records showed no injury).  Because Plaintiff cannot show a violation of his Eighth Amendment rights, we hold that the district court properly granted summary judgment to the defendants.[4]

---

[4]  Plaintiff also contends that his lawsuit should not have been dismissed because *Braggs, et al. v. Dunn, et al.*, No. 2:14-CV-601 (M.D. Al.) (referred to by Plaintiff as "*Dun v. Dun*") was decided differently.  That ongoing class action lawsuit, however, is unrelated to Plaintiff's claim here.

## <u>Conclusion</u>

We **AFFIRM** the district court.

14