[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-14288

Non-Argument Calendar

_____

TYLER HARRISON,

Plaintiff-Appellant,

*versus*

SHERIFF, HOLMES COUNTY FLORIDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:22-cv-00005-RH-MJF

_____

Before WILSON, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

This is a disability discrimination case brought under the Rehabilitation Act ("RA").  Tyler Harrison, a former employee of the Holmes County Sheriff's Office, alleged that the Sheriff constructively discharged him because of his mental health issues. The district court granted summary judgment for the Sheriff.

At bottom, this appeal hinges on whether Harrison's alleged constructive discharge was based (1) solely on Harrison's mental illness; or (2) at least partially on Harrison making misleading comments about his relationship with his coworker, and shooting himself while intoxicated and on call in a county vehicle.  Harrison argues that a reasonable jury could find that it was the first alternative.  We disagree and affirm the district court's summary judgment order.

## I.    Background

Harrison began his employment with the Holmes County, Florida Sheriff's Department in 2001 as a correctional officer.  He eventually became a certified law enforcement officer, achieved the rank of  lieutenant, and oversaw narcotics investigations.  In 2018, after taking twelve weeks of leave under the Family and Medical Leave Act ("FMLA") because of a self-inflicted gunshot wound that he suffered while on call in his patrol vehicle, Harrison resigned.

Almost four years later, Harrison filed a civil complaint against the Holmes County Sheriff, alleging that he was constructively discharged on the basis of his actual or perceived disability—namely, his mental health issues—in violation of the RA. The relevant facts here, construed in the light most favorable to Harrison, fall into three buckets: Harrison's (1) relationship with his coworker, Page Fleming, (2) history of mental illness culminating in his suicide attempt, and (3) resignation. We discuss each in turn.

A. *Harrison's Relationship with Page Fleming*

Harrison worked alongside Page Fleming in the narcotics division. They worked closely together, and spent time together outside of work. One night in the fall of 2017, Harrison and Fleming were "hanging out" and "had a few drinks." "[O]ne thing led to another" and they "ha[d] sex." But according to Fleming, they did not engage in an ongoing sexual relationship.

In October 2017, the Sheriff received a call from Fleming's ex-husband stating that something was going on between Harrison and Fleming. Based on the call, the Sheriff directed Harrison's direct supervisor, Major Michael Raley, to inquire into the status of Harrison's and Fleming's relationship. On October 30, 2017, Raley met with both Harrison and Fleming separately; each denied that there was anything "going on" between them.[1] But Fleming later

---

[1] Both Harrison and Fleming claim that their denials were truthful because they were not asked specifically if they had sex.

4                    Opinion of the Court                    22-14288

revealed that, before her meeting with Raley, Harrison told Fleming not to say anything to Raley about their intimacy.[2]

### B. Harrison's History with Mental Illness

Harrison suffers from stress, anxiety, depression, PTSD, and alcoholism. Harrison's general practitioner, Dr. Contini, diagnosed Harrison with depression in February 2017, and Harrison took medication for depression and anxiety throughout 2017. Despite taking medication, Harrison's depression worsened, causing sleep disruption and reducing his ability to concentrate and communicate. Harrison then saw Dr. Joy Rabon for two counseling sessions. She diagnosed Harrison with generalized anxiety disorder. She also stated that Harrison had what she "felt like" was alcoholism, depression, and PTSD, but did not make a formal diagnosis.

Harrison's mental health struggles were not kept secret. Harrison told Tate (before he became Sheriff) that he was depressed, told Raley that he was seeing a counselor, and told Deputy Ryan Segers that he was struggling with depression and taking medication.

In 2017, Sheriff Tate heard rumors that Harrison had been drinking a lot and asked Raley to talk to Harrison about it. Harrison told Raley that he was struggling with alcoholism. Around this same time, Harrison told Fleming he was drinking

_____

[2] It violates the Sheriff's office policy to "make any false or misleading statements or misrepresent facts under any circumstances."

more and that he was seeing a doctor about his depression and sadness. Fleming even accompanied Harrison to his first counseling session with Dr. Rabon. Fleming also reported to Raley that Harrison was depressed and that Raley needed to call Harrison to check on him.

Harrison's mental health issues came to a head on January 1, 2018. Fleming received a call from Harrison in the early afternoon. Harrison, who was working on call, was "crying really, really bad" and was incomprehensible. Fleming kept him on the phone until she could get to him. When she arrived on the scene, Harrison was sitting in the driver's seat of his unmarked police truck with a revolver in his hand. She could tell that Harrison was drunk.[3] Fleming then saw Harrison point the gun at himself and heard a gunshot. Harrison had shot himself under his chin.[4] Fleming administered first aid until first responders arrived on the scene. Harrison was hospitalized and later discharged on January 3, 2018.

On January 22, 2018, Harrison received FMLA leave for the injuries he sustained from the shooting. He received twelve weeks

---

[3] It violates office policy to bring alcohol into any county vehicle, to use alcohol while on duty, and to use alcohol while armed.

[4] Harrison initially claimed the shooting was accidental. However, in his reply brief, Harrison concedes that "the record makes clear that the shooting was anything but accidental, and the situation was reported immediately as an attempted suicide." Given the surrounding circumstances, we find, for summary judgment purposes, that the shooting was a suicide attempt.

of leave, dated back to January 2, 2018. The medical notes stated that Harrison had "acute stress disorder" and "will be following with a mental health disorder."

### C. Harrison's Resignation

Sometime during Harrison's FMLA leave, Raley told Harrison that if he did not resign, the Sheriff would investigate "the shooting" and "the [Fleming] thing" to support terminating him. However, he was told that after one year, he could return. On April 2, 2018, the day Harrison was set to return from FMLA leave, he received a Notice of Internal Investigation which stated that he would be investigated for allegedly violating several of the office's policies, including "Unbecoming Conduct," "Use of Intoxicants," and "Testimonies and Truthfulness." Harrison resigned the same day. Despite being told that he could return after a year, Harrison was never hired back by the Sheriff's Office.

In support of his claim for discriminatory constructive discharge and disparate treatment, Harrison pointed to several comparators who he claimed engaged in similar misconduct but were treated differently. First, Investigator Ken Tate took FMLA leave for over four months to recover from heart surgery, was reportedly drinking on duty, and allegedly sexually harassed Fleming. Yet, Tate was not investigated or asked to resign. Second, Patrol Officer Zack Neitsch, while off duty, caused a car accident resulting in a death but was not forced to resign or threatened with termination. And third, Greg Gordon "was

contributing alcohol to an 18-year-old girl and sleeping with her" but was not fired.

The Sheriff denied that Harrison was constructively discharged, and stated that Harrison violated office policies by making misleading comments about his relationship with his coworker, and by shooting himself while intoxicated in a county vehicle. Accordingly, the Sheriff maintained that Harrison could not make out a *prima facie* case of discrimination and moved for summary judgment.

The district court held a hearing and orally granted the Sheriff's motion for summary judgment. Applying the *McDonnell Douglas*[5] framework, the district court first found that Harrison was not disabled within the meaning of the RA because there was no evidence that Harrison was diagnosed with alcoholism or that his depression was a permanent condition that substantially impaired a major life activity.[6] But even assuming the presence of a disability, the court found that Harrison was not constructively discharged solely by reason of his alleged disability as required under the RA. Instead, the court found Harrison was discharged

---

[5] *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

[6] For Rehabilitation Act purposes, a "disability" is "a physical or mental impairment that substantially limits one or more major life activities." *See* 29 U.S.C. § 705(9)(B) (cross-referencing 42 U.S.C. § 12102). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

because he had committed actionable misconduct. Harrison and Fleming had been in a relationship of some sort and Harrison had admitted to telling Fleming not to tell the Sheriff about their relationship. The district court also found that Harrison had been drunk on call in a county vehicle, which constituted fireable misconduct even if his actions were caused by a mental health disability. The district court also distinguished the comparators from Harrison. Finally, the district court explained that Harrison failed to show that the Sheriff's reasons were pretext for discrimination based on a disability. Thus, the court granted summary judgment for the Sheriff. Harrison appealed.

## II.    Standard of Review

We review a district court's grant of summary judgment *de novo*. *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1333 (11th Cir. 2022). Summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quotations omitted). All submitted evidence is viewed in the light most favorable to the non-moving party. *Owens*, 52 F.4th at 1333.

## III.    Discussion

On appeal, Harrison argues that the district court erred in finding that he had (1) not established a *prima facie* case of disability

discrimination under the RA; and (2) not shown that the Sheriff's stated reasons for Harrison's constructive discharge were pretextual.  After review, we affirm the district court.

The RA prohibits federally funded programs from discriminating against qualified individuals with a disability. 29 U.S.C. § 794(a).    RA and Americans with Disabilities Act ("ADA") claims are analyzed under the same legal framework. *Owens*, 52 F.4th at 1333–34.  "[T]hus, cases involving the ADA are precedent for those involving the [RA]." *Id.* at 1334 (alterations in original) (quoting *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005)). A plaintiff can survive summary judgment by either (1) alleging direct discrimination; (2) satisfying the *McDonnell Douglas* burden-shifting framework; or (3) demonstrating a convincing mosaic of circumstantial evidence warranting an inference of intentional discrimination.  *Lewis v. City of Union City*, 918 F.3d 1213, 1220 & n.6 (11th Cir. 2019) (*en banc*) ("*Lewis I*"); *Center v. Sec'y, Dep't of Homeland Sec.*, 895 F.3d 1295, 1303 (11th Cir. 2018).  Because Harrison has not alleged direct discrimination, he must either (1) satisfy the *McDonnell Douglas* burden-shifting framework, or (2) show a convincing mosaic of circumstantial evidence warranting an inference of intentional discrimination.

A *prima facie* case under the RA requires that the plaintiff show he (1) has a disability or is perceived as having such a disability; (2) is qualified for the job; and (3) suffered an adverse employment action as a result of the disability.  *Center*, 895 F.3d at

1303.[7] The plaintiff must prove that the adverse employment action was "solely by reason of" his disability. 29 U.S.C. § 794(a); *see also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008) (noting that "plaintiffs claiming intentional discrimination under the RA must show that they were discriminated against '*solely* by reason of [their] disability,' [while] the ADA requires only the lesser 'but for' standard of causation" (internal citation omitted)).[8] Thus, a plaintiff suing under the RA cannot prevail if the employer based the adverse employment action partially on disability and partially on other factors. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Under *McDonnell Douglas*, if the plaintiff establishes a *prima facie* case of disability discrimination, and the employer articulates a legitimate, nondiscriminatory reason for its decision, the plaintiff must then show that the stated reason was pretext for discrimination. *Center*, 895 F.3d at 1303. The burden of persuasion remains on the employee throughout. *Id.*

---

[7] A voluntary resignation is not an adverse action, but a resignation is not voluntary if it was a constructive discharge forced by an employer's duress or misrepresentation of a material fact. *Hargray v. City of Hallandale*, 57 F.3d 1560, 1567, 1570 (11th Cir. 1995).

[8] *Compare* 29 U.S.C. § 794(a) (RA provision providing that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of* her or his disability, . . . be subjected to discrimination . . . ." (emphasis added)), *with* 42 U.S.C. § 12132 (ADA provision for public employers providing that "no qualified individual with a disability shall, *by reason of* such disability, . . . be subjected to discrimination . . . ." (emphasis added)).

Here, even assuming that Harrison is (1) disabled, (2) qualified for the job, and (3) suffered an adverse employment action, the adverse action was not based solely on a disability. *See* 29 U.S.C. § 794(a). Reviewing the facts in the light most favorable to Harrison, he was constructively discharged, at least in part (if not entirely), based on misconduct unrelated to his disability. By Harrison's own account, the Sheriff stated that he would investigate "the shooting" *and* "the [Fleming] thing" to support terminating Harrison. And the official notice of investigation stated that Harrison would be investigated for "Unbecoming Conduct," "Use of Intoxicants," *and* "Testimonies and Truthfulness." Because the dishonest statements about his relationship with Fleming are clearly unrelated to any alleged disability, his alleged constructive discharge was based at least partially on factors other than his disability. Thus, he cannot establish a *prima facie* case of discrimination under the RA. *See Ellis*, 432 F.3d at 1326.

Even the conduct that Harrison argues was tied to his disability—being drunk and armed while on call in a county vehicle—is a fireable offense irrespective of whether his disability involved depression and alcoholism. *See Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1217 (11th Cir. 2021). In *Todd*, the plaintiff teacher threatened to kill herself and her child, took "an excessive amount of Xanax while at school," and threatened to harm school administrators. *Id.* We held that, even though the teacher's threats likely stemmed from her depressive disorder, the defendant school district was not required by the RA to countenance dangerous

misconduct just because it was caused by a disability. *Id.* The same holds true here. Harrison was intoxicated while on call behind the wheel of his patrol car, and discharged a firearm in the presence of two individuals. This conduct endangered himself, other officers, and members of the community. And there is no evidence that the alleged constructive discharge was based on Harrison having a disability, rather than the dangerous conduct that his disability may have caused.

Finally, none of the comparators Harrison presented is similar enough to establish disparate treatment. "[A] plaintiff must show that [he] and [his] comparators are 'similarly situated in all material respects.'" *Lewis*, 918 F.3d 1213. Ordinarily, a similarly situated employee will have (1) engaged in the same basic conduct or misconduct as the plaintiff; (2) been subject to the same employment policy, guideline, or rule as the plaintiff; (3) been under the same supervisor as the plaintiff; and (4) have the same employment or disciplinary history as the plaintiff. *Id.* at 1227. Ken Tate was accused of sexual harassment and drinking on the job (which he denied); Neitsch caused a deadly car accident while off duty; and Gordon was accused by a criminal defendant of providing alcohol to and sleeping with an 18-year-old. None of these comparators both made misleading comments about a sexual relationship with a coworker and drunkenly shot themselves while

22-14288                Opinion of the Court                13

on call in a county car.  Thus, Harrison fails to make out a *prima facie* case of disability discrimination.[9]

## IV.  Conclusion

Because Harrison failed to make out essential elements of his *prima facie* case[10] of disability discrimination under the RA, the

---

[9] We need not venture any further with the *McDonnell Douglas* test to resolve Harrison's claim, because his failure to make out a *prima facie* case "reflects a failure of the overall evidence." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 945 (11th Cir. 2023).  "Under *McDonnell Douglas*, the failure to establish a prima facie case is fatal only where it reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination." *Id.* at 947.  For example, "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case," but, "[a] plaintiff who fails to prove that she was a member of a protected class . . . or that she suffered an adverse employment action, will be unable to prove that she was unlawfully discriminated against." *Id.* at 946.

Here, not only has Harrison failed to produce a comparator, but he has also failed to show that he was fired solely because of a disability—a necessary element of his ultimate claim.  Thus, because Harrison's failure to make out a *prima facie* case "reflects a failure of the overall evidence," we need not consider his argument that the Sheriff's proffered reasons for his constructive discharge were pretextual. *Id.* at 945–47.

[10] While not addressed by the district court, Harrison made passing reference below and on appeal to an alternative "convincing mosaic" framework for showing employment discrimination.  Under such a framework, "we look beyond the prima facie case to consider all relevant evidence in the record to decide the ultimate question of intentional discrimination." *Tynes*, 88 F.4th at 947.  But regardless of whether we apply the *McDonnell Douglas* test or the convincing mosaic framework, Harrison must still point to enough evidence for a reasonable factfinder to infer that he was fired solely because of a disability.  For the reasons discussed above, Harrison has failed to do so.

district court did not err in granting the Sheriff's summary judgment motion.

**AFFIRMED.**